Jane C. CALDWELL, Plaintiff,

v.

Michael O. LEAVITT, Administrator for the United States Environmental Protection Agency, Defendant.

No. 1:03 CV 707.

United States District Court,
M.D. North Carolina.

April 19, 2005.

John Heydt Philbeck, Allen & Pinnix, P.A., Raleigh, NC, for Plaintiff.

## ORDER and JUDGMENT

OSTEEN, District Judge.

The court has before it this Standing Order 30 recommendation by the Magistrate Judge that summary judgment for the Defendant should be granted. The Plaintiff timely objected to the recommendation and the Defendant timely responded.

The record, including the Plaintiff's objections and the Defendant's response, has been reviewed by this court, and it is the opinion of this court that the recommendation is in accord with the facts and the prevailing law. The court adopts the recommendation of the Magistrate Judge, entered March 10, 2005, as its own findings and conclusions.

IT IS THEREFORE ORDERED that Defendant's alternative motion for summary judgment [22] should be and is hereby granted.

IT IS FURTHER ORDERED AND ADJUDGED that this proceeding is hereby dismissed.

## RECOMMENDATION AND ORDER OF UNITED STATES MAGISTRATE JUDGE

DIXON, United States Magistrate Judge.

This matter is before the court on Defendant's motion to dismiss or, alternatively, for summary judgment (docket no. 22–1) and on Defendant's motion to strike the "Appendix of Additional Relevant Citations of Fact" attached to Plaintiff's brief and portions of the affidavits of Plaintiff Jane Caldwell, Sharon Taylor, Allen Marcus, Gregory Blumenthal, Annie Jarabek, and Amy Grady (docket no. 29–1). Plaintiff has responded to Defendant's motions. In this posture, the matter is ripe for disposition. For the reasons stated below, Defendant's motion to strike will be granted in part. Furthermore, it will be recommended that the court grant Defendant's motion for summary judgment.

### Background

Plaintiff filed a complaint against Defendant on July 28, 2003, alleging sex discrimination based on disparate treatment and hostile work environment under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.). Plaintiff requests declaratory judgment, injunctive relief, compensatory and punitive damages, back pay, a jury trial, and other appropriate relief. In the motion for summary judgment, filed December 15, 2004, Defendant contends that the court should dismiss Plaintiff's disparate treatment claim for failure to exhaust administrative remedies. Defendant also contends that summary judgment is proper on Plaintiff's hostile work environment claim because there is no genuine issue as to any material fact as to that claim and Defendant is entitled to judgment as a matter of law.

### Defendant's Motion to Strike

█ The court first considers Defendant's motion to strike from the record the Appendix attached to Plaintiff's brief in opposition to the motion for summary judgment. Plaintiff filed a twenty-page response brief and attached an Appendix to her brief. The appendix is a five-page list of "Cites Relating to EEO Complainant's Complaints of Discrimination and

Management's Failure to Investigate" and "Additional Relevant Citations of Fact." Defendant contends that the Appendix is an extension of Plaintiff's legal arguments in condensed form and must therefore comply with the page limitations established by this court's local rules. *See* Local Rule 56.1(c) ("The page limitation for briefs on all motions, established by LR 7.3(d), apply to summary judgment briefs."); Local Rule 7.3(d) (establishing that "responsive briefs are limited in length to 20 pages"). This court agrees. Thus, the court will grant Defendant's motion to strike Plaintiff's Appendix, and the court will not consider it in addressing the summary judgment motion. Defendant also moves to strike portions of the affidavits of Plaintiff, Taylor, Marcus, Blumenthal, Jarabek, and Grady. Specifically, Defendant contends that certain portions of the challenged affidavits are not based on the personal knowledge of the affiants and/or they contain inadmissible hearsay.

■ In considering a motion for summary judgment, the court can evaluate the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in making its determination. FED. R. CIV. P. 56(c). According to Rule 56(e), affidavits filed in support of a summary judgment motion

> shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers ... referred to in an affidavit shall be attached thereto or served therewith ... the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial.

As Rule 56(e) makes clear, an affidavit submitted on summary judgment "must present evidence in substantially the same form as if the affiant were testifying in court." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996). Thus, in the absence of an affirmative showing of personal knowledge of specific facts, a court cannot consider such an affidavit in making its summary judgment determination. *See Antonio v. Barnes*, 464 F.2d 584, 585 (4th Cir.1972). Furthermore, summary judgment affidavits cannot be based on inadmissible hearsay. *Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251–52 (4th Cir.1991); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 973–74 n. 8 (4th Cir. 1990). The court has carefully examined the portions of the affidavits that Defendant wants stricken. To the extent that portions of the challenged affidavits are, indeed, not based on personal knowledge, consist of inadmissible hearsay, or do not otherwise comply with Rule 56(e), they will not be considered on Defendant's motion for summary judgment. Thus, Defendant's motion to strike will be granted in part.

### Facts

Here, the court presents a factual account of the evidence and information contained in the record. For purposes of ruling on Defendant's motion for summary judgment, Plaintiff is entitled to have "her version of matters in dispute accepted, and the benefit of all favorable inferences," *Fisher v. Maryland Dept. of Housing & Cmty. Dev.*, 32 F.Supp.2d 257, 262 (D.Md. 1998), at least so long as there is proper support in the record under FED. R. CIV. P. 56 for her version of events. Therefore, the summary recounted here clearly reflects Plaintiff's version of the facts. Defendant vigorously disputes many of Plaintiff's factual allegations.

In 1986, Plaintiff received her Ph.D. in Toxicology from the University of North Carolina at Chapel Hill. Caldwell Aff. ¶ 41. In 1991, Plaintiff began her employment with the United States Environmental Protection Agency ("EPA") as an Environmental Scientist in the Office of Air Quality Planning and Standards ("OAQPS"). Caldwell Aff. ¶ 42. In March 1999, Plaintiff was assigned to work on a detail at EPA's Office of Research and Development ("ORD") in the National Center for Environmental Assessment, Research Triangle Park Division ("NCEA–RTP"), where she was assigned to the Hazardous Pollutant Assessment Group ("HPAG") working under the supervision of HPAG branch chief Michel Stevens. Caldwell Aff. ¶¶ 43, 45. The HPAG branch was one of two branches at NCEA–RTP. The other branch was the Environmental Media Assessment Group ("EMAG"). Robert Elias served as branch chief for the EMAG branch from January 2001 to January 2003. Furthermore, at all relevant times, and unless otherwise specified, Lester Grant was the Director of NCEA–RTP, Randy Brady was Assistant Director, and Chon Shoaf was the Associate Lab Director.

In August 2000 Plaintiff became a permanent employee at NCEA–RTP working in the HPAG branch. Caldwell Aff. ¶ 46. Plaintiff alleges that from April 12, 1999, and continuously until at least April 5, 2001, and thereafter, she was subjected to ongoing and unwelcome harassment because of her gender and stemming from a hostile work environment within the NCEA–RTP against females, which was in part created and facilitated by her former manager Michel Stevens. Plaintiff separates her two claims for disparate treat-

ment and hostile work environment based on incidents occurring before and after her EEO filing.

### Pre–Filing Period: Claims of Disparate Treatment/Hostile Work Environment Before April 2001

*Different Treatment of Female Scientists by Stevens*

Most of Plaintiff's allegations focus on the behavior of her former supervisor Michel Stevens. According to Plaintiff, Stevens acted openly hostile towards her and the other female scientists in the office and treated them differently from the male scientists. Caldwell Aff. ¶¶ 60, 69. Plaintiff states that in her performance reviews and other meetings, Stevens often made negative, condescending, and hostile remarks about female staff at NCEA–RTP and in the EPA offices in D.C.; whereas he never made such disparaging remarks about any male employees.[1] Caldwell Aff. ¶¶ 69, 70. For instance, Stevens had labeled another female scientist, Annie Jarabek, as a "bitch." Caldwell Aff. ¶ 60. Plaintiff specifically points to Stevens' behavior towards her and the other female scientists during branch meetings. At these meetings male employees were allowed to speak freely and engage in discussions in an assertive manner without criticism. Caldwell Aff. ¶ 72. Stevens, however, would frequently "cut off" or otherwise terminate the discussions initiated by the female employees, including Plaintiff, and he would criticize them openly at the meetings in a rude and hostile manner. *See* Caldwell Aff. ¶ 88. Specifically, on around June 2000, before Plaintiff was hired as a permanent employee at NCEA–RTP, a co-worker, Gary Foureman, was giving a presentation at a branch meeting.

---

**1.** Stevens denies ever making any negative, condescending, or hostile remarks to or about any of the females working at NCEA–RTP, including during the time when Plaintiff worked in the HPAG branch. Stevens Dec. ¶ 3.

Plaintiff started asking Foureman numerous questions about the project, and Foureman "stormed out of the meeting."[2] Caldwell Aff. ¶ 71. Stevens later reprimanded Plaintiff for being rude to Foureman. Stevens told Plaintiff that asking too many questions was bad for her career and that she was too vocal and assertive. Caldwell Aff. ¶ 71. After the June 2000 branch meeting Stevens became increasingly hostile to Plaintiff whenever she asked a question or otherwise spoke during the weekly branch meetings. Caldwell Aff. ¶ 72. When Plaintiff interviewed with Stevens for the position as a permanent employee in August 2000, Stevens again told her that she was "too assertive" and that she still "asked too many questions." Caldwell Aff. ¶ 76.

Plaintiff asserts that male and female employees at NCEA–RTP were also treated differently in how management handled their travel requests. For instance, Stevens frequently refused to grant Plaintiff's travel requests necessary for her work under the pretext that since Plaintiff's work was to benefit the D.C. office of NCEA only, that NCEA–DC would have to pay for the travel.[3] Caldwell Aff. ¶¶ 55, 64. By contrast, Stevens frequently approved travel arrangements for male employees, including Foureman, who were doing work that was similarly beneficial to NCEA–DC. Caldwell Aff.

¶ 55. Plaintiff alleges the following additional examples of how Stevens treated male employees more favorably than female employees under his supervision and in ways that interfered with the female scientists' professional development: Stevens would arrange appointments with male employees ahead of time, whereas he would simply show up unannounced for appointments with Plaintiff; he provided feedback to male employees on their action plans, but he would not give Plaintiff feedback on her action plans; he constantly scrutinized the work of the female scientists but not the male scientists; and whereas he criticized Plaintiff for her collaborative efforts with the D.C. office, he praised the male employees for similar collaborative efforts with the D.C. office. Caldwell Aff. ¶¶ 87, 98.

*Plaintiff's Performance Review*

Plaintiff states that Stevens' discriminatory behavior towards her culminated in his statements to her at her performance review on February 8, 2001, when he told her that he would not recommend her for a promotion to the next federal salary grade level no matter what her qualifications were and even though her paperwork reflected that her performance had been satisfactory. *See* Caldwell Aff. ¶¶ 89, 92, 99, 102, 103, 106. Plaintiff states that at the performance review Stevens again told her that she talked too much in branch meet-

---

2. Foureman's and Stevens' version of events at the meeting are very different from Plaintiff's version. According to Foureman, Plaintiff "would not be quiet long enough to allow either myself or others present to voice or reason out their opinions." *See* Letter from Gary Foureman of June 6, 2001, attached to Brady Dep. as Ex. EPA 02447. Stevens states that he reprimanded Plaintiff because her conduct had been disruptive to the meeting, and Stevens further asserts that "Dr. Caldwell's tendency to interrupt other speakers is part of her conversational style." Stevens Aff. ¶ 12.

3. For instance, Plaintiff states that she traveled away from the office on July 15, 1999, and October 8, 1999, in support of a project she was working on for NCEA–RTP, and Stevens refused to allow NCEA–RTP pay for her travel expenses. *See* Caldwell Aff. ¶ 64. Plaintiff states that, by contrast, male members of Stevens's group such as Foureman who were assigned to NCEA–RTP but working on projects with NCEA–DC staff were granted travel pay from NCEA–RTP.

ings and was too assertive. Plaintiff also asserts that on around March 20, 2001, at a luncheon with several male employees, Stevens made disparaging and untrue remarks about several female employees at NCEA–RTP, including Plaintiff. For instance, Stevens falsely stated that Plaintiff had still not finished a major project she had been working on, and he further stated that Plaintiff's work had "no value" to NCEA–RTP. *See* Caldwell Aff. ¶ 109.

*Harassing Behavior from Co–Workers pre EEO–Filing*

Plaintiff also cites several incidents of alleged sexual harassment by male co-workers during the pre-filing period. Plaintiff states, for instance, that in Summer 1999 she began to find emails of a sexual nature in her chair at work. Caldwell Aff. ¶ 51. Specifically, she identified an email placed there on August 23, 1999, as being printed out by Jay Garner, a male staff member. The email was a collection of jokes containing offensive and sexist remarks. Caldwell Aff. ¶ 52. During 2000 Plaintiff occasionally found offensive material in her chair and threw it away. She points to two dates in particular-April 6, 2000, and August 2, 2000–when she found emails in her chair from co-worker Alan Hoyt. Caldwell Aff. ¶¶ 53, 54. Plaintiff also alleges that she often noticed pornographic cartoons and other illustrations denigrating to females in Hoyt's office.[4] Caldwell Aff. ¶ 52.

As another example of sexual harassment by coworkers, Plaintiff also states that one of the male staff members, Gary Foureman, "seemed to like to touch female staff members and when in conversation with him, Foureman would get uncomfortably close to me." Caldwell Aff. ¶ 59. In October 2000, another female employee, Judy Strickland, was in Plaintiff's office when Foureman walked in and put his arm around Strickland and started to squeeze her shoulder. Caldwell Aff. ¶ 58. Plaintiff states that soon after the incident with Strickland and Foureman she complained to one of her managers, Jim Raub, about Foureman. Caldwell Aff. ¶ 59. Plaintiff also recounts another incident in late Summer/Fall of 2000 involving Foureman. According to Plaintiff, Foureman, while wearing short shorts, approached her in a break room and put one of his legs up on a chair next to Plaintiff with his legs and crotch area very close to Plaintiff's face. Plaintiff turned away and asked him to get away from her.[5] Caldwell Aff. ¶ 63. Finally, Plaintiff recounts a branch meeting on April 3, 2001, in which employees were taking a "climate survey," designed to measure how the employees perceived the work environment and whether there was a perception of discrimination. Caldwell Aff. ¶ 118. While copies of the survey were being distributed, Foureman commented that "it has been my experience that only bitchy people fill these out and that people like me who don't care don't [fill them out], so that the results are skewed. Therefore, I am going to fill mine out." Caldwell Aff. ¶ 118. According to Plaintiff, Stevens was at the meeting and responded that the survey should be filled out and that management takes the surveys seriously, but Stevens did not otherwise reprimand Foureman.

*The EEO Charges*

On April 5, 2001, Plaintiff initiated contact with an EEO counselor "concerning

---

4. Plaintiff's former co-worker Jim Raub testified that every couple of weeks, Allen Hoyt sent out office emails that contained sexist remarks or caricatures. Raub Dep. pp. 220–21. Raub further testified that he had also seen other material of a "sexual nature" distributed by other people in the office other than Hoyt. Raub Dep. pp. 220–24.

5. Plaintiff does not indicate whether she complained to anyone about this incident.

my being subjected to disparate treatment and harassment because of gender bias." Caldwell Aff. ¶ 123. On May 15, 2001, Plaintiff filed a formal EEO complaint. Around that same time, three other female employees-Sharon Taylor, Amy Grady, and Marsha Marsh-also filed EEO complaints against Defendant for alleged sex discrimination and hostile work environment. On July 13, 2001, and August 7, 2001, Plaintiff filed supplemental EEO complaints alleging retaliation by Defendant.[6] On April 29, 2003, the EPA issued a right-to-sue letter. Plaintiff contends that after her EEO filing both her coworkers and supervisors continued to create a hostile work environment for her and the other female scientists at NCEA–RTP and furthermore that Defendant retaliated against her for filing the EEO charges.

### Post–Filing Period: Claims of Disparate Treatment Acts of Retaliation/Hostile Work Environment beginning in April 2001

#### Acts By NCEA–RTP Management

Plaintiff contends that NCEA–RTP management retaliated against her for filing the EEO complaint and further created a hostile work environment for her, in numerous ways including, but not limited to, the following: (1) her computer was tampered with and her emails were monitored, see Caldwell Aff. ¶¶ 151, 156; (2) NCEA–RTP management, particularly NCEA–RTP Director Lester Grant, delayed and interfered with Plaintiff's various promotion and work opportunities, including her work on a children's health program, see Caldwell Aff. ¶¶ 145–49; (3) management intentionally delayed the approval and forwarding of Plaintiff's pro-

motion package; (4) management delayed getting Plaintiff approved for "flexiplace," which is a work arrangement pursuant to EPA's personnel policy in which qualified employees are allowed to perform EPA work in a location other than their assigned workplace, see ¶¶ 162–67, 178, 184, 185, 191, 359; (5) management retaliated against her by firing another employee, Greg Blumenthal, in an effort to make her miss a deadline for a project she had been working on with Blumenthal, see Caldwell Aff. ¶¶ 336, 434–36, 439, 443; and (6) NCEA–RTP Assistant Director Randy Brady retaliated against her by initiating a disciplinary action against her and the other EEO complainants for improper contact with an EPA contractor, see Caldwell Aff. ¶¶ 11, 290, 292.[7] Finally, the court notes that at the end of June 2001, pursuant to their requests, Plaintiff and the other EEO complainants were moved away from the office building into a different building because they had begun to fear for their personal safety. See Caldwell Aff. ¶ 417. Plaintiff states that for a substantial time period, NCEA–RTP management failed to provide Plaintiff and the other EEO complainants with sufficient office furniture, email, and voice mail, and that management also interfered with their ability to receive office mail. See Caldwell Aff. ¶¶ 494, 549, 552, 555.

#### Acts by Co–Workers and Anonymous Sources

Plaintiff also cites conduct by her coworkers after she initiated contact with EEO that she contends were acts of retaliation and that contributed to the hostile work environment towards her and the other female scientists at NCEA–RTP. For instance, on or about April 10, 2001,

---

6. In her formal EEO complaint filed on May 15, 2001, Plaintiff also alleged that she had been retaliated against since first initiating EEO contact. See Caldwell Aff. ¶ 7.

7. Plaintiff cites numerous additional incidents of alleged retaliation in her affidavit. See Caldwell Aff. ¶ 11.

one of Plaintiff's co-workers, Jim Raub, called Plaintiff into his office and began discussing a study he had found on the internet about penis lengths.[8] Caldwell Aff. ¶ 129. Plaintiff laughed nervously and said, "I didn't hear this." Raub assured Plaintiff that the conversation was "okay" since it was "medical" in nature. Caldwell Aff. ¶ 129. On another day around April 2001 Raub met with Plaintiff and another EEO complainant Sharon Taylor in his office and said that he had a "confession" to make. He then told Plaintiff and Taylor that he had a fixation with staring at women's breasts and he asked if either of them had noticed. Caldwell Aff. ¶ 153.

Plaintiff also cites an incident occurring on around April 27, 2001, in which one of the other EEO complainants, Marsha Marsh, showed Plaintiff a piece of paper that had been attached to her office chair. It was a poem by Henry Wadsworth Longfellow, which read, "I know a maiden fair to see, Take Care! She can both false and friendly be, Beware! Beware! Trust her not. She is fooling thee." Caldwell Aff. ¶ 159. Plaintiff also states that on or around May 22, 2001, during a branch meeting, Mark Greenberg, a male member of the group, asked whether Marsha Marsh could do a job for him that "would not take any brains to do-perfect for Marsh." Caldwell Aff. ¶ 239. Another male member "seconded" that suggestion.

Plaintiff also points to an incident occurring in May 2001 that she contends was an act of intimidation by her co-workers. Plaintiff had been a member of a "tea club" at the office. The "tea club" was a group of NCEA–RTP staff that met informally every morning and afternoon to taste teas from all over the world. The tea club was disbanded by management in around November 2000. Plaintiff states that on May 29, 2001, she found in her chair an envelope from an anonymous source that contained a one-page document titled "TEE–D Off Times: a Magazine for Distasteful Teem–Building 'When They Take the Cha out of Tee.'" *See* CALD–00839, attached as an exhibit to Raub Deposition. The document appeared to be a review of a China White Tea called "SO WHY MEE (*Camellia assassina*)." The tea was described in the document as having a "tri-leaf" structure, "with thorns," "overfermented," and "giving a very dark appearance." The tea review further stated that the tea was "high in caffeine," had a "bitter taste," could be "extremely irritating," that it should not be steeped too long, and that it made good iced tea. Plaintiff believes that the tea described in the document was meant to symbolize the women who had filed the EEO complaints, i.e., that they were "bitter," could be "extremely irritating," and that they should be "iced." *See* Caldwell Aff. ¶ 258. Plaintiff states that the envelope left in her chair also contained an index card containing a quote from Shakespeare's play King Lear, stating "Oh, that madness lies; let me shun that." Plaintiff notes that the King Lear quotation was a reference to three treacherous daughters who betray their father, and Plaintiff interpreted the quotation as referring to the women's filing of the EEO complaints.[9] Caldwell Aff. ¶ 266.

---

8. Although Raub is also described in Plaintiff's evidence as one of her supervisors, it does not appear that he had any immediate or successively higher authority over Plaintiff. *See* Raub Dep. pp. 21–22.

9. Plaintiff believes that her co-worker Raub placed the King Lear quotation and the "Teed–Off Times" document in her chair. Raub denies having placed either document in Plaintiff's chair. Raub Dep. p. 179, line 23.

Plaintiff also points to an email sent to her and the other EEO complainants by her co-worker Raub after they had initiated EEO contact. On May 3, 2001, Raub sent an email entitled "Fussy Females Play Away" to Plaintiff, Marsha Marsh, and Sharon Taylor, as well as to some male employees. Caldwell Aff. ¶¶ 168–69. The article stated, in part:

> Females interact sneakily with males of their own species. Ben Sheldon, of the University of Oxford, and colleagues have discovered that females have sophisticated ways of avoiding the pitfalls of their environment when they interact with testosterone-controlled males.

Raub Dep. p. 133, lines 17–23; Pl.'s Ex. 6, attached to Alapas Dep. The email offended Plaintiff and the other complainants, and they sent it to EPA headquarters in Washington, D.C. Raub then sent out an email apology the same day. Raub Dep. p. 133, lines 17–23. Plaintiff interprets the "Fussy Females" email as further intimidation of her and the other EEO complainants.

Plaintiff also states that her car and the cars of the other EEO complainants were vandalized while in the EPA parking lot. Finally, Plaintiff contends that at multiple times from April 5, 2001, to December 31, 2001, both she, Taylor, and Marsh complained to EPA management at various levels concerning their discriminatory treatment based on their gender and the hostile work environment that existed against women in NCEA–RTP, but that management failed to correct the environment.

*Sharon Taylor*

Sharon Taylor also filed an EEO complaint against Defendant based on allegations similar to those brought by Plaintiff.[10] On October 19, 2000, Taylor interviewed for an ecologist position at NCEA–RTP within the EMAG branch. Taylor Aff. ¶ 2. Taylor interviewed with NCEA–RTP Director Lester Grant. According to Taylor, Grant told her in the interview that he had planned to hire a male ecologist, but "my having two doctorate degrees changed everything." Taylor Aff. ¶ 2. Grant assured Taylor that if she were hired she would be responsible for developing numerous "high-profile" programs, she would spend 20 to 25% of her time pursuing her own research interests, and she would be funded to attend professional meetings. Taylor Aff. ¶ 2. Taylor also states that during the hiring negotiations Assistant Director Randy Brady told her that she

---

**10.** The court notes that the testimony of the other EEO complainants is relevant in this case to show discriminatory motive and to show what the general work atmosphere was like for Plaintiff and other women working at NCEA–RTP. *See, e.g., Heyne v. Caruso,* 69 F.3d 1475, 1480 (9th Cir.1995) (holding that evidence of the defendant employer's harassment of other women is admissible in a sex discrimination case because such evidence bears on the defendant's discriminatory intent); *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1156 (10th Cir.1990) (holding that testimony by other employees about the defendant's mistreatment of them based on age was relevant to the issue of discriminatory intent in a Title VII age discrimination case); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir. 1987) (stating that incidents of sexual harassment directed at employees other than the plaintiff can be used as evidence of hostile work environment harassment because they are evidence of the general work atmosphere). Furthermore, in determining whether a subjectively hostile work environment existed for Plaintiff, this court may consider any admissible evidence of the above-described conduct directed toward other women if Plaintiff was aware of that conduct. *See Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir.1995). Both Plaintiff's and Taylor's affidavits indicate that Plaintiff was well aware of the alleged discrimination against the other female employees, including Taylor, Grady, and Jarabek, *see* Caldwell Aff. ¶ 112; Taylor Aff. ¶ 24.

would be promoted to another federal salary grade level within a year. Taylor Aff. ¶ 3.

Taylor began her employment at NCEA–RTP on February 5, 2001. Rather than being assigned to the EMAG branch (the position she had interviewed for), she was told that she would be working in the HPAG branch instead and that Michel Stevens was going to be her supervisor. Taylor Aff. ¶ 4. Stevens told Taylor that Grant had decided to hire two ecologists instead of one and that the male ecologist, Dr. Tim Lewis, was going to have the original position in the EMAG branch. Stevens told Taylor that he and Grant had really wanted to hire Lewis, but since they were under pressure to hire women and minorities and since Taylor had two doctorate degrees and was a female Stevens and Grant would have to justify to EPA headquarters why they could not offer Taylor the position. Therefore, they had decided to hire both Taylor and Lewis. Taylor Aff. ¶ 4.

According to Taylor, during her conversation with Stevens on February 5, 2001, he explained who was on his staff and warned her to avoid the other females in the branch because, according to Stevens, they "all had problems and were not productive." Taylor Aff. ¶ 4. Stevens then made the following statements to Taylor: If Taylor ever wanted to be considered for a promotion, she should not associate with the other females in the office; Taylor should avoid Annie Jarabek and Marsha Marsh; Plaintiff had no potential for a promotion and he was not going to recommend her for a promotion; Marsha Marsh had mental problems; Gertrude tried to destroy him by sending out a vicious email about him and Randy Brady was going to get Gertrude for what she did; Annie Jarabek had mental problems, was a problem employee, and got advantages that she didn't deserve; Nancy Broom and Emily Lee only had high school degrees but got promoted because they were females; and Beverly Comfort was black and living with Chon Shoaf (a male employee) and got advantages she didn't deserve. Taylor Aff. ¶ 5. Stevens also told Taylor that she should not work because she has small children. Taylor Aff. ¶ 5.

According to Taylor, rather than starting her on "high-profile" projects as she had been promised in her interview, Stevens informed her that her sole function for her first year was to try to engage people in the branch in ecology discussions. Taylor Aff. ¶ 7. He also told her that it would take seven to ten years before she could be promoted to the next grade level. Taylor Aff. ¶ 8. Stevens also warned Taylor that she was not to contact anyone professionally outside of the office, explaining that he had let Annie Jarabek "work directly with Headquarters and that she had then turned on him and that Judy Strickland had contact with industry and then she left him and he was going to make sure this didn't happen with [Taylor]." Taylor Aff. ¶ 7.

Taylor's contentions regarding Stevens' behavior towards her and the other female scientists at NCEA–RTP are similar to Plaintiff's. For instance, Taylor states that Stevens did not allow women to freely participate in branch meetings, and he refused to give women professional opportunities that were granted to the male employees. Taylor Aff. ¶ 6. For instance, on February 8, 2001, Taylor asked Stevens for authorization for her to go with two male ecologists to an ecologist conference located nearby. Stevens refused to let her go, explaining that Taylor was not to be away from the office where she could do what two other female scientists, Annie Jarabek and Judy Strickland, had done to him. Taylor Aff. ¶ 9. Stevens also told

Taylor that she could not work on an Endocrine Disruptor project because she might do what Annie Jarabek had done to him and that she could not attend an Endocrine Disruptor meeting in Atlanta because she had small children and should not travel. Taylor Aff. ¶ 9. Taylor also recounts that at a branch meeting in March 2001 co-worker Jim Raub interrupted her and told her that what she was saying was not important and that she was "overly assertive for a female." Taylor Aff. ¶¶ 23, 26. Finally, Taylor states that in April 2001, her supervisor Elias informed her that she was not going to be approved for flexiplace because she had two small children even though she had made arrangements for childcare. Taylor Aff. ¶ 31.

Taylor cites additional incidents that she contends demonstrate a hostile and dismissive attitude towards the female scientists at NCEA–RTP. For instance, on February 14, 2001, a Special Assistant for Ecology from EPA's headquarters came to meet the ecology staff at NCEA–RTP. Grant introduced the male members of the staff, including the new male ecologist, Tim Lewis, by stating their backgrounds and scientific degrees and then he let each of them discuss their projects. By contrast, Grant introduced Taylor only as "that's Sharon" and "she's new," and he did not give her the opportunity to speak. Taylor Aff. ¶ 11. Taylor states that around that same time (February 14–16), she met with Stevens to "take exception" to having her position switched to the other branch with a different supervisor, having training requests denied, and being directed by him not to contact anyone outside of the office professionally. Taylor Aff. ¶ 10. During these conversations, Stevens admitted to Taylor that he was not officially allowed to prevent her from contacting other scientists. When Taylor reminded Stevens that this was the opposite of what he had previously told her, he "became angry and raised his voice saying that I would be terminated if I spoke to anyone." Taylor Aff. ¶ 14. Stevens also told Taylor if she said anything to EPA headquarters about her position being switched he and Grant would give her "lots of busy work" and then fire her. Taylor Aff. ¶ 12.

On around February 20, 2001, Taylor called Mike Moore, Head of Personnel in EPA's headquarters in D.C., and told him about her concerns about the way females were being treated at NCEA–RTP. Taylor Aff. ¶ 13. Moore told Taylor to report her concerns to Grant and to take detailed notes. On February 22, 2001, Taylor met with Grant and gave him a copy of a memo she had given to Stevens outlining her concerns. Taylor Aff. ¶ 15. Taylor also brought up her concerns about the gender-biased derogatory cartoons and jokes that were being circulated around the office. Grant "got angry, red in the face, stood up, leaned over me inches from my face and began waving his finger and hand right in my face," and then yelled at her that she "better never report anything to D.C. [headquarters]" and informed her that he could fire her "at any time without any reasons." Taylor Aff. ¶¶ 15, 18, 23. Taylor called Moore again, and he informed her that he would discuss the situation with George Alapas, Acting Director of NCEA headquarters. Taylor Aff. ¶ 15.

On February 26, 2001, Grant came to Taylor's office and told her that if she reported anything from their conversation from February 22 to D.C. headquarters that she would be fired. Taylor Aff. ¶ 16. Later that morning, Dr. Mike Slimak, Associate Director for Ecology in D.C., called Taylor and Taylor told Slimak about

Grant's threat.[11] Taylor Aff. ¶ 16. Slimak told her that he would call Grant to discuss what happened to Taylor's ecology position and projects. Taylor Aff. ¶ 16. On February 27, 2001, Slimak called Taylor and told her that he had spoken to Grant about assigning her back to the EMAG branch with all of the other ecologists. Taylor Aff. ¶ 17. On February 28, 2001, Grant came to Taylor's office and "angrily began waiving his finger inches from my face again while he informed me how furious he was that Slimak called him." Taylor Aff. ¶ 18. Under pressure from EPA management in D.C., Grant switched Taylor back to the EMAG branch, but she had no real projects to work on despite her multiple requests. Taylor Aff. ¶ 19.

Taylor states that after she reported her concerns to NCEA–RTP management on or around February 22, 2001, she experienced numerous acts of computer tampering on her office computer. Taylor Aff. ¶¶ 20, 36, 37, 38, 46. She also states that management at NCEA–RTP, including Elias, Grant, Brady, and Stevens, excessively scrutinized her time and attendance records, monitored her local and long-distance phone calls, removed her from work projects for no apparent reason, denied her travel and training while allowing it for male employees, and threatened her verbally. Taylor Aff. ¶¶ 20, 29, 31, 36, 41, 50, 51. For instance, on April 10, 2001, Brady walked into Taylor's office, handed her a paper on the Florida panther, and told her that he would make sure that she would never work on such species of wildlife again if she pursued an EEO complaint. Taylor Aff. ¶ 30. According to Taylor, NCEA–RTP management also tried to persuade her not to pursue the EEO complaint by bribing her. For instance, on April 4, 2001, Elias told Taylor that he would reinstate her projects if she would not report anything to the EEO and would agree to deny everything that she had already reported.[12]

Taylor also states that she received threatening notes by both known and anonymous persons after she initiated EEO contact. For instance, on April 9, 2001, Taylor found an anonymous sign in her office stating: "When the last tree is cut down, the last fish eaten, and the last stream poisoned, you will realize that you cannot eat money." Taylor Aff. ¶¶ 27, 29. On May 3, 2001, Taylor received the same "Fussy Females" email from Raub that Plaintiff received. Taylor Aff. ¶ 33. Finally, Taylor states that sometime around April 2001 a radiator hose was cut on her vehicle while it was parked on the EPA campus. Taylor Aff. ¶ 44.

Taylor also corroborates Plaintiff's allegation that NCEA–RTP employees Jay Garner and Allen Hoyt commonly circulated gender-biased derogatory cartoons and jokes to others in the office, including Taylor. Taylor Aff. ¶ 34. Taylor also recounts the discussion with Raub in April 2001 when Raub told her and Plaintiff about his obsession with staring at women's breasts. Taylor Aff. ¶ 35. Taylor also states that on a later date when she went to Raub's office to discuss a work project he rolled his chair very close to her, then tried to reach over with one hand and touch her knee while reiterating his comments about how he liked to stare at her breasts. Taylor Aff. ¶ 35. Taylor told him to "back off," and she reported his behavior to Alapas and Art Payne, Deputy

---

11. Slimak states that he does not recall having this conversation with Taylor. Slimak Dep. p. 22, lines 21–22; p. 23, lines 20–24.

12. Elias adamantly denies that he ever said this to Taylor. Elias Dep. pp. 35–37. In fact, Elias states that he never discussed the EEO complaint with Taylor at all. Elias Dep. p. 38, lines 3–10.

Director of NCEA headquarters. Taylor Aff. ¶ 35.

On June 4, 2001, Taylor received the same "Notice of Warning" that Plaintiff had received from Brady accusing Plaintiff and Taylor of improper contacts with a contractor employee. Taylor Aff. ¶ 47. Like Plaintiff, Taylor states that Brady's allegations were without merit and that the letter of warning was sent out in retaliation for their EEO filings. Taylor Aff. ¶ 47. As another example of alleged retaliation by management, on May 23, 2001, Elias informed Taylor at a branch meeting that she was denied approval to go to a Wildlife Disease Association meeting, but he did not give her a reason for the denial. Taylor Aff. ¶ 41. He later emailed her to tell her that she could go to another meeting, but later he told her in the hallway that she could not go and that she should not have reported anything to EPA headquarters in D.C. Taylor Aff. ¶ 41. Taylor also states that on June 19, 2001, Brady approached her by the stairwell in the NCEA–RTP building and "said something to the effect that we got Greg [Blumenthal] fired and we'll get you to [sic], and you are going to get hurt.'" Taylor Aff. ¶ 61.

*Allen Marcus*

Allen Marcus has worked at NCEA–RTP as a statistician since 1993. Marcus Aff. ¶ 2. According to Marcus, he was a known sympathizer of Plaintiff and the other women who filed the EEO complaints, and management at NCEA–RTP

retaliated against him because of it.[13] Marcus Aff. ¶¶ 7, 9. Marcus states that on May 21, 2001, he met with Grant to discuss a science issue, and Grant started talking about the EEO investigation. Grant said to Marcus in a loud tone, while pointing his finger at him, "There's a lot of activity here involving [EEO] cases and attorneys. I hope you're not involved in it, because everybody who is involved is going to be hurt by it-hurt badly-and that includes you." Marcus Aff. ¶ 9. Marcus later told Plaintiff what Grant had said to him. Marcus Aff. ¶ 11. Marcus also states that sometime around late April or May 2001, he observed Grant reprimanding Taylor in the office hallway. Marcus Aff. ¶ 5. According to Marcus, Grant was making "threatening gestures" at Taylor, "standing close to her, less than two feet, gesturing with his hands and pointing his finger at her, using a loud voice." Marcus Aff. ¶ 5. Marcus believed that they were talking about differing perceptions between Grant and Taylor about the conditions of employment under which Taylor was hired. Marcus Aff. ¶ 5.

Marcus states that in a staff meeting held around August 17, 2001, Brady informed the attendees at the meeting that the females who had filed the EEO complaints "had no case."[14] Marcus Aff. ¶ 22. Marcus also states that at the meeting Elias also told the attendees that the EEO complainants were "only in it for the money."[15] Marcus Aff. ¶ 22. Marcus states that on around June 11, 2002, he sent an

---

13. For instance, Marcus asserts that Brady falsely accused him of violating security procedures by leaving his computer on overnight. Marcus Aff. ¶ 17. Marcus also asserts that he was subject to computer tampering because he was sympathetic to the women. Specifically, he states that his email log was printed out and he suddenly began having trouble accessing files on his computer. Marcus Aff. ¶ 5. Finally, like Plaintiff and Taylor, Marcus

states that since the EEO filings his car has been vandalized while in the EPA parking lot. Marcus Aff. ¶ 27.

14. Brady denies saying this. Brady Dep. p. 287, lines 16–21.

15. Elias denies saying this. Elias Dep. p. 248, line 13.

email to George Alapas in D.C. about another staff meeting in which certain staff members made disparaging comments about the EEO complainants. Marcus Aff. ¶ 24. Marcus states that disparaging comments about Plaintiff and the other EEO complainants had been "ongoing and relatively frequent by management and staff at the Branch Meetings." Marcus Aff. ¶ 24.

*Gregory Blumenthal*

Greg Blumenthal worked as a health scientist at NCEA–RTP from October 10, 2000, until around June 13, 2001, when he was fired for alleged computer tampering. Blumenthal Aff. ¶¶ 3, 39. Blumenthal's immediate supervisor was Michel Stevens. Blumenthal's and Stevens' offices were next to each other and Blumenthal often overheard conversations between Stevens and other staff members, particularly when Stevens was having "heated discussions." Blumenthal Aff. ¶ 8. Blumenthal states that throughout his tenure at EPA, he noticed that the heated discussions occurred only between Stevens and the two female members of the group, Plaintiff and Judy Strickland, and not with any of the male members. Blumenthal Aff. ¶ 9. Blumenthal states that Stevens often screamed and yelled at Plaintiff and other female employees at NCEA–RTP, whereas he never screamed and yelled at the "predominantly male employees" at NCEA–RTP. Blumenthal Aff. ¶¶ 8–13. According to Blumenthal, Stevens' practice of yelling and screaming at Plaintiff continued frequently until Stevens' office was relocated around April 2001. Blumenthal Aff. ¶ 13.

In around February 2001, Blumenthal was named as a Union Steward, which meant that part of his duties were to assist and counsel EPA employees who were experiencing personnel issues or concerns at the workplace. Blumenthal Aff. ¶ 14. In his capacity as Union Steward, Blumenthal frequently assisted and counseled Plaintiff, Taylor, Grady, and Marsh about their concerns regarding their perceived discriminatory treatment. Blumenthal Aff. ¶ 15. Blumenthal states that almost immediately after he began helping Plaintiff and the other women, he noticed that management employees, particularly Stevens and Brady, began treating him in a hostile manner. Blumenthal Aff. ¶ 16.

Blumenthal also states that he noticed that female EPA employees were frequently treated differently from the male employees during branch meetings. Blumenthal Aff. ¶ 18. According to Blumenthal, during the branch meetings, the male EPA employees were allowed to speak freely and engage in discussions in an assertive manner without receiving criticism from the male EPA management employees. Blumenthal Aff. ¶ 19. Blumenthal states that during the same branch meetings, however, Stevens would frequently embarrass and humiliate the female EPA employees, including Plaintiff, through his open and public criticism of them. Blumenthal Aff. ¶ 20. Stevens also frequently cut off or terminated discussions initiated by the female employees. Blumenthal Aff. ¶ 20. Blumenthal does not recall that Stevens ever cut off conversations initiated by male EPA employees or otherwise treated the male employees in a rude or hostile manner. Blumenthal Aff. ¶ 21.

Blumenthal further states that in March 2001 he attended a luncheon with Stevens, Chon Shoaf (Associate Lab Director), and Charles Ris (D.C.Management). Blumenthal states that during the last fifteen minutes of the luncheon Stevens began a tirade by disparaging Plaintiff and another female employee, Vanessa Vu. Stevens stated that Vu's "existence" was purportedly "an obstacle for getting things done."

Blumenthal Aff. ¶¶ 23, 24. Stevens also stated that Plaintiff was "lazy" and "arrogant" and that her work was "of no value" to his branch.[16] Blumenthal Aff. ¶ 24.

Blumenthal states that sometime in May 2001, in his position as Union Steward, he tried to help Plaintiff find out whether someone was tampering with her computer, specifically, whether someone had been printing out her email log without her authorization. Blumenthal Aff. ¶¶ 29, 32. Blumenthal accessed process logs listed on Lotus Notes to try to find out who was printing the email log but he was unable to determine the source. Blumenthal Aff. ¶ 33. On or around June 13, 2001, Brady fired Blumenthal and had him escorted out of the building by four armed guards. Blumenthal Aff. ¶ 38. Blumenthal's termination letter contained "vague allegations that I was involved in unauthorized computer tampering." Blumenthal Aff. ¶ 39.

*Amy Grady*

Amy Grady began working at NCEA–RTP as a statistician on February 5, 2001, and worked under the supervision of Robert Elias, the then-acting branch chief of the EMAG branch. Grady Aff. p. 2. In around April 2001, Grady filed an EEO complaint against Defendant alleging sexual discrimination, sexual harassment, non-sexual harassment, reprisal/retribution, and hostile work environment. Grady Aff. p. 2. Grady asserts that as a female scientist her "experiences and incidents are similar, embedded, and overlapping with" those of Plaintiff and the other EEO complainants. Grady Aff. p. 2.

Grady states that she has "both witnessed and experienced the demeaning

and dismissive behavior that the NCEA–RTP management and many of the NCEA–RTP scientists exhibit towards the female scientists." Grady Aff. p. 8. Grady states, for instance, that in a monthly branch meeting Jim Raub cut off Taylor while she was discussing wildlife ecology research and told her that her work was not important. Grady Aff. p. 9. Grady states further that on numerous occasions the female scientists have been treated as support staff. Grady Aff. p. 9. For instance, Elias once assigned Grady and Plaintiff the task of proofreading a document for grammatical and spelling errors. All of the male employees were exempted from this task. Grady Aff. pp. 6, 9. Grady asserts that she was "also shocked at the disparity between the female and male scientists" when, for example, she learned that whereas Taylor was forbidden to have any contact with colleagues outside of NCEA–RTP, Tim Lewis, a newly hired male ecologist, was allowed to accept an editorship on a professional journal. Grady Aff. p. 6. Grady also states that NCEA–RTP does not appear to allocate funding for female scientists "with respect to honoring verbal agreements made during interviews, to evaluating scientific merit, or even financial planning." Grady Aff. p. 8.

Grady further states although several men in the office were freely granted flexiplace, management at NCEA–RTP did not want to give Taylor flexiplace because she was a "mom with small kids" and they believed she would use flexiplace as a daycare solution even though she informed them that she had made childcare arrangements.[17] Grady Aff. p. 7. Grady also

---

**16.** Chon Shoaf states that he does not remember being at a luncheon with Blumenthal and Stevens, and he does not recall Stevens ever making disparaging remarks about Plaintiff or any other females at NCEA–RTP. Shoaf

Dec. ¶¶ 7, 8, attached as Ex. E. to Def.'s Materials Supp. Mot. Summ. J.

**17.** Grady states that she witnessed a conversation between Elias and Taylor in which Elias stated that Taylor was denied flexiplace

states that she has witnessed disparities between the way NCEA–RTP management deals with travel requests from the female and male scientists. Grady Aff. p. 8.

Furthermore, Grady recounts several statements by her supervisor Elias that she contends were sexist. Grady states, for instance, that on April 18th, 2001, Elias told Grady that gender bias was a "subtle problem" and he recommended to her that she should make sure that she was known as a "statistician" rather than as a "female statistician." Grady Aff. p. 11. At the meeting, Elias also said that women tended not to work on evenings and weekends as often as men. According to Grady, Elias went on to state that since men also have families, family responsibilities could not be the reason that women did not work overtime and therefore maybe it was a trait women had.[18] Grady Aff. p. 11. As an example of other sexist remarks being made in the office, Grady also cites the "Fussy Females" email sent out by Raub.

Grady also states that she has seen the "proliferation of pornography in the NCEA–RTP." Grady Aff. p. 11. According to Grady, "I have had Dr. Jay Garner not only tell me sexually explicit jokes but also hand me Xeroxed copies of sexually explicit and gender derogatory material." Grady Aff. p. 11. Finally, as an example

of what Grady perceives as management's attempts to silence the female scientists at NCEA–RTP, Grady recounts an incident involving the climate survey that employees were told to fill out on April 3, 2001. Grady states that her supervisor Elias told her that since she was a new employee she was not allowed to fill it out. Grady Aff. p. 9. Grady contacted personnel in D.C. to ask about this, and she was told that she could complete the survey.[19]

### Annie Jarabek

Annie Jarabek was transferred from another division of EPA to NCEA–RTP in January 1988 and for part of the time that she was in the NCEA–RTP office she worked under the supervision of Michel Stevens.[20] Jarabek Aff. p. 17. Jarabek and Stevens did not get along, and Jarabek describes Stevens as "the most negative person I have ever worked for." Jarabek Aff. p. 8. Jarabek contends that Stevens was continually hostile towards her and critical of her and she attributes his animosity to "50% personality conflict and 50% treatment because I am female." Jarabek Aff. p. 10.

Jarabek states that during her tenure at NCEA–RTP she also had "lack of promotion issues" with one of her supervisors Chon Shoaf, a male. According to Jarabek, Shoaf told her once that she did not need a promotion "as a single female."[21]

---

because she was a mom with two children. The court further notes that Marcus has testified that he had no problem receiving approval for flexiplace. He states that he was approved for unconditional flexiplace within about two weeks of his request in June 2000, and the flexiplace agreement remained in effect until he was reassigned to another program in November 2002. Marcus Aff. ¶ 22.

**18.** Elias denies talking to Grady at all about gender bias in the workplace. Elias Dep. pp. 42–44.

**19.** Like Plaintiff and the other EEO complainants, Grady also asserts that she was subject

to computer tampering. Specifically, she states that her email log was printed without her authorization. Grady Aff. p. 2. She also states that her computer had been tampered with on dates that coincided with significant stages in the EEOC grievance procedure.

**20.** Jarabek still works in NCEA at RTP for a number of EPA projects, but she is no longer in the immediate office involved in the allegations here.

**21.** In her affidavit, Jarabek recounts an incident of alleged sexual harassment by co-worker Foureman in 1994. The court finds that

Jarabek Aff. p. 3. Jarabek states that she felt that she was treated differently as a female while working at NCEA–RTP and that "the office does not embrace diversity." According to Jarabek she was denied travel that was granted for male employees and she was not allowed to give invited presentations. Jarabek Aff. p. 16. She also states that party invitations were always addressed to employees' "wives" and when she suggested that it be changed to "something more inclusive" such as "spouses" or "significant others" she simply got "strange looks." Jarabek Aff. p. 15. Jarabek states that Stevens complained about diversity training each time he was required to attend and made fun of it. According to Jarabek, she also heard Grant refer more than once to his then ultimate boss, EPA Administrator Carol Browner, as a "bimbo with a law degree." Jarabek Aff. p. 15. Finally, Jarabek states that she never filed an EEO complaint because she considered it "an exercise in futility." Jarabek Aff. p. 18..

### Discussion

#### A. Summary Judgment Standard

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once

the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED. R. CIV. P. 56(e)).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Virginia,* 67 F.3d 53, 56 (4th Cir.1995). Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251, 106 S.Ct. 2505 (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex,* 477 U.S. at 331, 106 S.Ct. 2548 (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

*Failure to Exhaust Administrative Remedies As to Plaintiff's Disparate Treatment Claim*

 Defendant first contends that Plaintiff's disparate treatment claim should

---

this incident is too remote in time from the time when Plaintiff contends she was subjected to a hostile work environment (beginning in 1999) and cannot be used to support Plain-

tiff's hostile work environment claim. Thus, the court does not consider this evidence in ruling on the motion for summary judgment.

be dismissed because she failed to exhaust her administrative remedies. As a federal employee, Plaintiff was required to exhaust her administrative remedies before bringing a Title VII claim for discrimination in district court. *Bond v. Potter*, 348 F.Supp.2d 525, 528 (M.D.N.C.2004); 42 U.S.C. § 2000e–16(c). As part of the exhaustion requirement, Plaintiff was required to initiate contact with an EEO counselor within 45 days of the date on which she knew or should have known of the alleged discrimination. 29 C.F.R. § 1614.105(a)(1). Here, Plaintiff sought EEO counseling on April 5, 2001. When she sought counseling on this date, Plaintiff complained that she was discriminated against on the basis of gender on February 8, 2001, when Stevens told her during her performance review that he would not recommend her for a promotion no matter what her qualifications were. Caldwell Dep. p. 35., lines 10–13. Since Plaintiff failed to initiate EEO contact within 45 days of February 8, 2001, she did not timely exhaust her administrative remedies as to that claim.

■ In any event, even on the merits, summary judgment should be granted to Defendant on Plaintiff's disparate treatment claim because Plaintiff has not shown that she has suffered from any adverse employment action. In the absence of direct evidence, to prevail on a timely claim of disparate treatment under Title VII, a plaintiff must establish a four-element prima facie case: (1) that the employee is a member of a protected class; (2) that the employee was qualified for the job and that her performance was satisfactory; (3) that in spite of her qualifications and performance, the employee suffered an adverse employment action; and (4) that the employee was treated differently from similarly situated employees.[22] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir.1989). Here, even if Plaintiff has produced evidence as to the first two prongs of her prima facie case, she cannot prevail on the third because Plaintiff simply fails to show that she suffered from any adverse employment action while employed at NCEA–RTP. Here, Plaintiff was neither fired, nor did she fail to get promoted. To the contrary, and despite that Stevens told Plaintiff in February 2001 that he would not recommend her for a promotion, it is undisputed that Plaintiff's promotion package went forward, and Plaintiff was indeed promoted from a federal salary grade of GS–13 to GS–14.[23] Furthermore, Plaintiff has received numerous awards for her scientific achievements while she has been working at NCEA–RTP. Plaintiff Aff. ¶ 102. Plaintiff's failure to produce evidence of any adverse employment or personnel decision taken against her is fatal to her prima facie case of gender discrimination under a theory of disparate treatment.[24] *See, e.g., Nichols v. Comcast Cablevision of Maryland*, 84 F.Supp.2d 642, 654 (D.Md. 2000) (stating that the mere transfer of an

---

**22.** The court notes that Plaintiff is a federal employee and therefore her suit is brought under § 2000e–16, an anti-discrimination provision that applies only to federal employees. Nevertheless, she is still subject to the same prima facie case as non-federal employees.

**23.** Furthermore, Plaintiff has also since been assigned to work for the NCEA group in D.C.

**24.** Since Plaintiff has failed to offer evidence of any adverse employment action, the court need not evaluate whether plaintiff has shown that there were other similarly situated employees who were treated more favorably than her.

employee or an alteration in her job responsibilities does not constitute adverse employment. action). Thus, it is recommended that the court grant Defendant's summary judgment motion as to this claim.

*Hostile Work Environment*

■ The court next considers Plaintiff's claim for hostile work environment. The court first notes that Plaintiff did not fail to exhaust her administrative remedies as to this claim. In *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court noted that, unlike other discriminatory practices, a hostile work environment claim involves one unlawful employment practice that can be comprised of a series of separate incidents. *Id.* As long as one component incident occurred within the applicable limitations period, every component incident of the hostile environment may be considered for purposes of liability regardless of when those events occurred. *Id.* at 117–18, 122 S.Ct. 2061. Here, in support of her hostile work environment claim, Plaintiff alleged in her EEO charges that on March 20, 2001, Stevens told other EPA officials that her work was of "no value" to his branch and that he made untrue and disparaging remarks about her work assignments, abilities, and promotion potential.[25] *See* Lafone Dec. ¶ 3. The March 20 incident occurred within 45 days of when Plaintiff initiated EEO contact, and Plaintiff contends that it was a component of a continuing violation against her. *See Mosley v. Bojangles' Rests., Inc.,* No. 1:03CV50, 2004 WL 727033, at *4 (M.D.N.C. Mar. 30, 2004) (as long as one act occurs within the filing period the plaintiff's entire claim is consid-

ered to be timely filed). Thus, her claim for hostile work environment is not barred for failure to exhaust it in a timely fashion.

■ The court next considers whether there is a genuine issue of fact as to Plaintiff's claim for hostile work environment such that summary judgment would be improper. To prevail on a hostile work environment claim under Title VII, a plaintiff must show the following: (1) she was subjected to unwelcome conduct; (2) the alleged harasser engaged in this conduct "because of" her gender; (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment; and (4) there is some basis to impute liability to the employer. *Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 266 (4th Cir.2001).

■ Here, the court first notes that Plaintiff has clearly met the first prong of her hostile work environment claim-that is, she was subjected to unwelcome conduct. To satisfy the second prong of a hostile work environment claim, a plaintiff must demonstrate that the alleged harasser engaged in the unwelcome conduct "because of" her sex. This does not require that a plaintiff show that she was subjected to sexual advances or propositions or that the harassment was motivated by sexual desire. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Rather, "[t]he critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (internal quotations omitted). As this circuit's court of appeals has stated, "[a] work environment consumed

---

**25.** Stevens denies ever saying that Plaintiff had no value to his branch or making disparaging remarks about her work assignments,

abilities, and promotion potential. Stevens Dec. ¶¶ 15, 16.

by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances." *EEOC v. R & R Ventures, Inc.*, 244 F.3d 334, 340 (4th Cir. 2001) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir.2000) (reversing the district court's summary judgment in a case in which the plaintiff's supervisor had made neither sexual advances nor sexual propositions)).

■ Here, the court finds that Plaintiff has shown that there is a genuine issue of fact as to whether she was subjected to unwelcome conduct based on her sex. Plaintiff, Taylor, Grady, Blumenthal, and Marcus have all stated in their affidavits that they observed that Stevens' yelling, screaming, and constant criticism was directed solely towards the female scientists at NCEA–RTP, including Plaintiff. Furthermore, the affidavits raise an issue of fact as to whether the atmosphere at NCEA–RTP was laden with an anti-female animus, evidenced by the circulation of materials derogatory to women, the alleged dismissiveness towards the female scientists as compared to the male scientists during branch meetings, the different treatment of male and female scientists with regard to travel requests and flexiplace, and the constant berating and criticism by Stevens *towards female, but not male, employees.*

Defendant argues that Plaintiff has not shown that she was singled out for her gender. Defendant observes that Plaintiff's contention that Stevens only "called down" women and only demeaned women "is contradicted by Annie Jarabek's affidavit which shows that '[Stevens] has an attitude of terseness and dismissiveness/derisiveness to certain colleagues who were female and *sometimes to some of the male branch employees.'* " See

Def.'s Reply, p. 1 (citing Jarabek Aff. p. 26) (emphasis added). Defendant is absolutely correct that this statement in Jarabek's affidavit contradicts the statements in the affidavits of Plaintiff, Taylor, Grady, Blumenthal, and Marcus that Stevens directed his criticism towards the female scientists *only.* Indeed, whether Stevens berated and criticized only the female scientists is an issue of fact that is in dispute and thus cannot be resolved by this court on summary judgment. Similarly, Defendant also argues that Stevens reprimanded Plaintiff in a branch meeting held on around June 2000 not because she was a woman, but because she was being rude to her co-worker Foureman. Again, this is an issue of fact that must be resolved by a jury and not by this court on summary judgment. Thus, the court finds that Plaintiff has raised a genuine issue of fact as to whether the unwelcome conduct directed towards her was because of her gender.

■ To satisfy the third prong of a hostile work environment claim, the conduct must be sufficiently severe or pervasive to alter the conditions of employment. To be actionable, the conduct must be both objectively and subjectively offensive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To be objectively offensive, the conduct must create "an environment that a reasonable person would find hostile or abusive," otherwise it lies "beyond Title VII's purview." *Id.* In deciding whether a reasonable person in the plaintiff's position would find the environment hostile or abusive, a court should consider "all of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' "

*Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 333 (4th Cir.2003) (en banc) (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

Here, Plaintiff has produced enough evidence from which a jury could reasonably conclude that a pervasive, if not severe, anti-female animus was perpetuated in the NCEA–RTP office by management and co-workers, evidenced by numerous statements and conduct of management, and by Stevens in particular. The incidents alleged by Plaintiff and the other EEO complainants demonstrate a pattern of physical intimidation and verbal abuse by the all-male management at NCEA–RTP towards the female scientists.[26] For instance, Stevens constantly screamed and yelled at the female scientists, berated them, and attempted to silence them at branch meetings. Stevens specifically told Taylor that he had wanted to hire a male for the ecology position but that he was pressured to hire her because she was a woman. As for Grant, he specifically yelled at Taylor that she better not bring EEO charges or he would fire her. In support of its motion for summary judgment, Defendant argues that Plaintiff points to only three occasions during the two-year period under Stevens' supervision where she contends that Stevens verbally harassed her. Defendant categorizes the alleged behavior by Stevens and other male employees towards Plaintiff and the other female scientists as merely isolated and scattered and, thus, not sufficiently severe or pervasive as a matter of law. *See, e.g., Hartsell v. Duplex Prods., Inc.,* 123 F.3d 766, 773 (4th Cir.1997) ("But the claims propounded by Hartsell-even assuming them all to be true-are so trivial, so isolated, and so far from the paradigmatic case of sexual harassment, that summary judgment was clearly appropriate."). Assuming that the assertion by Plaintiff and the other affiants are true, the court does not agree that the alleged hostile behavior towards Plaintiff was merely isolated and scattered. Plaintiff and the other affiants, including two male employees at NCEA–RTP, make clear that Stevens' abusive behavior towards Plaintiff and the other female scientists was ongoing and constant, and Plaintiff has offered the specific dates merely as examples of what she and the affiants describe as constant and typical behavior by Stevens towards the female scientists in the office. Plaintiff and the other affiants have also produced evidence of behavior by other members of management and staff at NCEA–RTP that raises an issue of fact as to whether, in considering all of the circumstances, Plaintiff and the other female scientists were subjected to a hostile work environment.[27] Some of the evidence includes the following: Stevens labeled Annie Jarabek a "bitch," labeled all of the women in the office as having mental problems, and told Taylor that if she wanted to be promoted she should not associate with the other women in the office; Elias told Taylor that she should not work because she had small children, that she was not going to get flexiplace because she was a mom with two small children, and that she should try not to be known as a "female" scientist; co-workers Garner, Hoyt, and others commonly circulated through-

**26.** As the court has already noted, Plaintiff has raised an issue of fact as to whether this behavior was directed towards Plaintiff because of her gender.

**27.** Defendant denies most of the alleged statements by the male management tending to show a pervasive hostility towards the female scientists in the office. Indeed, the credibility of Plaintiff, the other women, and the male management at NCEA–RTP is a significant issue in this case, and this court may not issue findings on credibility on summary judgment.

out the office material that was sexual in nature and derogatory towards women; the female scientists in the office were assigned to performed menial tasks such as proofreading that the similarly situated male scientists were not assigned to do; Plaintiff was denied travel requests that were granted to the male scientists; when officials from EPA's office in D.C. came down to meet the new scientists, Grant introduced the male scientists, letting them talk about their projects, but merely introduced Taylor as "that's Sharon" and "she's new," and would not let her talk about her projects; and Grant more than once referred to his then ultimate boss Carol Browner as a "bimbo with a law degree." [28] Each of these separate incidents alone perhaps is neither sufficiently severe nor pervasive to establish a hostile work environment. Nevertheless, in hostile work environment cases, as the Supreme Court stated in *Oncale v. Sundowner Offshore Services, Inc.,* "[t]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" giving "careful consideration of the social context in which particular behavior occurs and is experienced by its target." 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). As the *Oncale* Court further observed, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 82, 118 S.Ct. 998. Here, the court finds that, in considering all of @the circumstances presented by Plaintiff and the other affiants regarding Plaintiff's workplace during the time in question, Plaintiff has raised an issue of fact as to whether the unwelcome conduct was sufficiently severe or pervasive to constitute a hostile work environment.

The court next considers whether Plaintiff has raised a genuine issue of fact as to whether liability may be imputed to Defendant for the hostile work environment allegedly created by Plaintiff's supervisors and co-workers at NCEA–RTP. When a non-supervisory co-worker harasses a fellow employee, the only basis for imputing that harassment to the employer is its "own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop" the harassment. *Mikels v. City of Durham,* 183 F.3d 323, 332 (4th Cir.1999); *Katz v. Dole,* 709 F.2d 251, 255–56 (4th Cir.1983). A plaintiff may demonstrate knowledge by proving that either: (1) "specific complaints [were] directed" to the plaintiff's superiors; or (2) "that a reasonable [person] intent on complying with Title VII would have known about the harassment." *Katz,* 709 F.2d at 255–56 (specific complaints); *Ocheltree,* 335 F.3d at 334 (reasonable person standard). The failure to provide "reasonable procedures for victims to register complaints" or the adoption of a "see no evil, hear no evil" approach will result in the employer's constructive knowledge of the harassment. *Ocheltree,* 335 F.3d at 334. Constructive knowledge may also be imputed if the harassment is so severe that the employer should have known about it. *Katz,* 709

---

**28.** Both Plaintiff and Taylor have made clear in their affidavits that they regularly communicated with each other and with the other female scientists in the office about the incidents occurring to each of them that they perceived as gender discrimination. Thus, Plaintiff was no doubt aware of the other women's experiences and their experiences are therefore relevant to show that Plaintiff subjectively perceived that the office atmosphere was hostile and abusive towards the female scientists, including herself.

F.2d at 255–56. Furthermore, an employer "on notice of sexual harassment must do more than indicate the existence of an official policy against such harassment." *Id.* at 256.

■ Here, as to the conduct of Plaintiff's non-supervisory co-workers, Plaintiff alleges that they created a hostile work environment for her by, among other things: circulating materials derogatory to women throughout the office, talking to her about inappropriate subjects, leaving anonymous threatening notes in her office, vandalizing her car, and tampering with her computer and emails.[29] Plaintiff does not assert that she complained to anyone except her co-worker Raub about the alleged pornographic materials that were being circulated throughout the office until the EEO complaints were filed.[30] *See* Brady Aff., attached to Brady Dep. as Ex. RB–50. In April 2001, Plaintiff did contact EPA officials in D.C. to complain about the pornography being passed around the office and about her co-worker Gary Foureman's touching of female staff. Caldwell Aff. ¶ 30. According to Plaintiff, management in D.C. did nothing in response to her complaints. The record, however, belies this assertion. In response to Plaintiff's and the other women's complaints about inappropriate behavior by co-workers, management promptly responded by holding branch meetings to discuss inappropriate behavior in the workplace and by sending out emails discussing inappropriate behavior. Furthermore, in response to the "Fussy Females" email sent out by Raub, management informed him on the same day that the email was inappropriate, and he issued an apology for it.

■ The court next considers whether liability may be imputed to Defendant based on the actions of Plaintiff's supervisors who had immediate or successively higher authority over her.[31] In *Ellerth* and *Faragher*, the Supreme Court established that under Title VII, employers are vicariously liable for hostile environment harassment perpetrated by a supervisor with immediate or successively higher authority over the plaintiff. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 780, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The only important qualification is that when the plaintiff suffered no tangible employment action, the employer is entitled to establish an affirmative defense consisting of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any … harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765,

---

**29.** The court notes that Plaintiff alleges that some of her supervisors committed these acts as well.

**30.** The management at NCEA–RTP contends generally that neither Plaintiff nor the other EEO complainants had ever complained about inappropriate touching by their male colleagues, inappropriate emails, or discrimination directed towards them because of their sex. Lester Grant stated in his deposition that the first time he became aware that Plaintiff had concerns about sexual harassment or sexual discrimination at NCEA–RTP was when she filed her EEO complaint, "sometime in early or mid-April." Grant Dep. at 102, lines 13–20. According to Brady, the complaints of Plaintiff and the other EEO complainants were often relayed in piecemeal fashion to NCEA–RTP officials from NCEA officials in Washington, D.C. *See* Brady Aff. pp. 2, 6, attached to Brady Dep. as Ex. RB–50.

**31.** Supervisors at NCEA–RTP who had immediate or successively higher authority over Plaintiff would appear to include, at the least, Stevens, Brady, and Grant.

118 S.Ct. 2257; *see also Matvia*, 259 F.3d at 266–67 (quoting *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275, and *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257); *Murray v. City of Winston–Salem*, 203 F.Supp.2d 493, 499 (M.D.N.C.2002). "As to the first element of the affirmative defense, 'dissemination of an effective anti-harassment policy provides compelling proof that an employer has exercised reasonable care to prevent and correct sexual harassment.'" *Murray*, 203 F.Supp.2d at 500 (quoting *Matvia*, 259 F.3d at 268). Plaintiff may rebut this proof with evidence that Defendant implemented the policy in bad faith or was deficient in enforcing the policy. *See id.*

Here, Plaintiff alleges that Defendant is vicariously liable for the conduct of Plaintiff's supervisor Stevens in that his conduct constituted at least one tangible employment action against her-that is, his refusal to approve or otherwise allow Plaintiff's promotion package to be submitted for consideration. As the court has already noted, however, it is undisputed that Plaintiff's promotion package was indeed put forward, notwithstanding Stevens' remarks to Plaintiff at her performance review that he would not give her a recommendation. Therefore, Stevens' remarks to Plaintiff at the performance review did not take the form of a tangible employment action, and Plaintiff has not shown that any other tangible employment action has been taken against her. Thus, Defendant may escape liability for the conduct of Stevens (and Plaintiff's other supervisors) if it can show that (1) it exercised reasonable care to prevent and correct promptly any ha-

rassing behavior and that (2) Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant or to avoid harm otherwise.

As to the first factor, Defendant has shown that during the relevant time period Defendant maintained a policy that prohibited sexual harassment, which was distributed to all employees, which was available on the EPA intranet, and which contained a complaint procedure. Laws Dec. ¶ 3. Furthermore, the policy was posted on the bulletin board in the main lobby of the office building where Plaintiff worked during 1999–2001 and was accessible to all employees at the main lobby location.[32] Plaintiff has failed to produce sufficient evidence to raise a genuine issue as to whether Defendant implemented its employment policy in bad faith or that Defendant was deficient in enforcing the policy. Indeed, EPA's policy allowed Plaintiff to bypass Stevens by providing contact information for EEO counselors to whom Plaintiff could directly report any claims of discrimination. The policy also encouraged Plaintiff to contact the Area Office of Civil Rights, which provides information on confidential counseling and legal recourse available within the Agency. *See* GE A–3. By providing clear direction of how to report harassment and by including a confidentiality provision, Defendant has shown that its policy was reasonably calculated to prevent and promptly correct any harassing behavior.

As to the second factor, Defendant contends that Plaintiff unreasonably failed to

---

**32.** In arguing that Defendant was deficient in enforcing its policy prohibiting sexual harassment, Plaintiff points to a statement by Raub in his deposition that he did not have EEO or sexual discrimination training, but Raub testified that he had a "recognition that was the requirement," he indicated that he had informal training, and he said "We all knew the nature of EEO and the requirements.... They're on bulletin boards." *See* Raub Dep. pp. 79–82. *See Matvia*, 259 F.3d at 268 (stating that "[i]n the face of a policy that clearly defines sexual harassment and to whom sexual harassment should be reported, [plaintiff] cannot survive summary judgment").

take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Plaintiff alleges that she complained about Stevens' behavior to several of her managers, including Shoaf, Raub, and Cogliano, but that they did nothing about it.[33] Plaintiff does not allege, however, that she specifically complained that Stevens' behavior towards her was motived by gender bias. Furthermore, once Plaintiff did report Stevens' behavior in April 2001 to officials in D.C. such as George Alapas and Mike Slimak, D.C. management took prompt remedial action reasonably calculated to end the harassment. For instance, the EPA initiated an investigation and detailed Stevens within eighteen days of Plaintiff's contact with an EEO counselor. *See* Pl.Ex. 31, located as an exhibit to Alapas Dep.; Memorandum from Lester Grant to All NCEA/RTP Staff of April 23, 2001, attached to Grant Dep. as CALD–00388, 00389. Stevens was detailed to another position effective April 23, 2001, and Beverly Comfort took Stevens' place as HPAG Branch Manager as of that date. *See* Def.'s Ex. 22, Email from Lester Grant to George Alapas of April 20, 2001, located as an Exhibit to Brady Deposition. Caldwell Aff. ¶ 142. D.C. management also took other actions to remove Brady and Grant out of their supervisory roles over Plaintiff and the other EEO complainants. Caldwell Aff. ¶ 418. For instance, on around June 21, 2001, Brady was replaced by Slimak as Acting Director at NCEA–RTP, and Slimak remained in

that position until early September 2001. Slimak Dep. p. 15, lines 4–10. Furthermore, Grant was placed on detail to NCEA–DC in June 2001. Caldwell Aff. ¶ 281. Finally, out of concerns for the safety of Plaintiff and the other three complainants, and pursuant to their requests, Plaintiff and the other three complainants were moved to another office out of the building where they had alleged the harassment had taken place. Slimak Dep. p. 20. Thus, the court finds that Defendant exercised reasonable care to address and promptly correct Plaintiff's complaint. As for harassment by co-workers Hoyt (pornographic emails), Garner (pornographic emails), Foureman (inappropriate touching of other women and inappropriate behavior towards Plaintiff), and Raub (inappropriate discussions), Plaintiff admits that she did not report alleged harassment by any of these men until April 2001 when she initiated EEO contact. *See* Slimak Dep. p. 66, line 7; p. 65. After Plaintiff and the other complainants notified Defendant of the inappropriate behavior by some of their co-workers such as Jim Raub, Defendant held group meetings over the course of the summer of 2001 and discussed with the employees what type of behavior was inappropriate in the office. Slimak Dep. p. 165, lines 23–25. NCEA–RTP management also sent out emails to all of the employees at NCEA–RTP discussing inappropriate behavior in the workplace. In sum, the court finds that after Plaintiff reported her concerns in

---

**33.** Plaintiff states that several times before she was hired as a permanent employee, and during the pre-EEO filing period, she complained to several of the male managers at EPA about Stevens' behavior, including Jim Raub, who was the acting branch chief, Chon Shoaf, who was an associate lab director, and Jim Cogliano, who was the then branch chief of the NCEA–DC. According to Plaintiff,

Raub, Shoaf, and Cogliano simply told her to "appease" Stevens and get hired. Caldwell Aff. ¶¶ 84, 85. Plaintiff does not, however, contend that she specifically complained that Stevens was singling her out for her gender. Shoaf has stated that Plaintiff never reported to him that she was being discriminated against by Stevens. Shoaf Dec. ¶ 6.

April 2001, Defendant took prompt measures to remedy the alleged harassment. *See generally Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131–32 (4th Cir.1995) (generally, actions "reasonably calculated to end harassment" include measures such as formal investigations, disciplining of perpetrator, written warnings, requiring counseling, and monitoring of perpetrator). Thus, Defendant has produced sufficient evidence to satisfy both elements of the *Faragher* and *Ellerth* affirmative defense to vicarious liability for conduct. Plaintiff has failed to produce sufficient evidence to rebut Defendant's proof and raise a genuine issue of fact for trial. Therefore, it will be recommended that the court grant summary to Defendant with respect to Plaintiff's hostile work environment claim.

*Plaintiff's Retaliation Claims*

Defendant next contends that it is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff has not raised a genuine issue of fact as to whether any adverse employment action was taken against her in retaliation for her filing the EEO charges. For the following reasons, the court agrees.

To establish a prima facie case of retaliation, an employee must show: (1) that the employee engaged in protected activity; (2) that the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir.2004). Once a prima facie case has been presented, the employer has the burden of producing a legitimate non-retaliatory reason for the adverse action, and the plaintiff must then show that the employer's proffered reasons are pretextual. *Price*, 380 F.3d at 212. It is clear that Title VII "affords no protection from discrimination unless there has been some

adverse employment action by the employer." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985).

The Supreme Court defines an "adverse employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257; *see also Mosley v. Bojangles' Restaurants, Inc.*, No. 1:03CV00050, 2004 WL 727033, at *5 (M.D.N.C. Mar.30, 2004). It is critical to note, however, that an employment action need not be "ultimate" to be "adverse." *Wagstaff v. City of Durham*, 233 F.Supp.2d 739, 744 (M.D.N.C.2002) (citing *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001) (internal quotation marks omitted) (stating that "conduct short of 'ultimate employment decisions' can constitute adverse employment action")). As this circuit's court of appeals held in *Von Gunten*, an "[a]dverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment." 243 F.3d at 866 (internal quotations omitted). Thus, the critical inquiry for this court is whether Plaintiff has demonstrated a genuine issue of material fact that these actions adversely affected the terms, conditions, or benefits of her employment. *See Von Gunten*, 243 F.3d at 866; *see also Mosley*, 2004 WL 727033, at *5.

Here, it is clear that in bringing the EEO charges Plaintiff was participating in protected activity under Title VII. Plaintiff's retaliation claim is fatally deficient, however, because she fails to raise a genuine issue of fact as to whether any adverse employment action was taken against her in retaliation for her EEO

filing. That is, Plaintiff has not shown that she suffered any formal or tangible impact on the terms or conditions of her employment such as a decrease in compensation, change in job title, level of responsibility, or lost opportunity or promotion. Indeed, since filing her claim, Plaintiff's salary has increased, as she was promoted within the federal pay grades from GS–13 to GS–14. Furthermore, Plaintiff has received numerous awards for her scientific achievements during her employment at NCEA–RTP. *See* Caldwell Dep. pp. 124, 142–43. Plaintiff points to the following actions that she contends were taken in retaliation for her EEO filing: Lester Grant delayed giving her permission to work on a particular project; she was delayed in receiving approval of a flexiplace request; office furniture, email, voice mail, and office mail were not provided to her as quickly as expected when she was moved to another location; her co-worker Raub initiated a conversation about penis length and his obsession with female breasts, and sent an email to her titled "Fussy Females"; and the firing Greg Blumenthal.[34] None of these events, however, constitute adverse employment actions because Plaintiff did not suffer any loss of pay, benefits, or status. This circuit's court of appeals has never held that Title VII exists to mandate civility in the workplace. *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999) ("Congress did not intend Title VII to provide redress for trivial discom-

forts endemic to employment."). For example, in *Munday v. Waste Management of North America, Inc.*, the court concluded that an employer instructing its employees to ignore and spy on the plaintiff, in addition to her manager yelling at her, did not constitute adverse employment action since there was no evidence that the terms, conditions, or benefits of her employment were affected. 126 F.3d 239, 243 (4th Cir.1997). In *Von Gunten,* the court held that Plaintiff had not demonstrated an adverse employment action, when, among other things, she asserted that another employee followed her around and questioned her activities. 243 F.3d at 869. Here, Plaintiff has not shown that her pay was reduced, that she was demoted, or that in any other way the terms, conditions, or benefits of her employment were adversely affected.[35] Plaintiff also cites numerous instances in her affidavit in which she perceived that co-workers and managers treated her in a rude and disrespectful manner. It is well established that Title VII was not intended to protect against mere rudeness in the workplace, and Plaintiff has not shown that the rudeness adversely affected the terms, conditions, or benefits of her employment.

Finally, Plaintiff asserts that Randy Brady retaliated against her by issuing a notice of warning to her and the other EEO complainants about improper contact

---

**34.** Plaintiff lists numerous other alleged acts of retaliation in her affidavit but, like the ones listed here, none of them resulted in the loss of pay, benefits, or status to Plaintiff.

**35.** Plaintiff also points to vandalism of her car in the EPA parking lot by anonymous persons, as well as alleged computer tampering. Again, these were not adverse employment actions for the purposes of a retaliation claim. Furthermore, Plaintiff has produced nothing more than speculation that the acts of vandalism to her car were done in retaliation by

Defendant or that Defendant was involved in the alleged computer tampering. Defendant has produced evidence to show that Information Technology ("IT") computer personnel investigated Plaintiff's claims regarding computer tampering and found no such computer tampering. *See* Slimak Dep. p. 103, lines 5–21; Brady Dep. p. 199, line 3; p. 204, line 5; Slimak Aff. pp. 5–6, attached to Slimak Dep. as Ex. MS–53; letter from Patricia English to Nancy Broom, attached to Brady Dep. as Ex. RB–14.

with an EPA contractor.[36] *See* Email from Randy Brady to Jane Caldwell of June 4, 2001, attached to Brady Dep. as Ex. RB-15. Indeed, Michael Slimak testified that he believed that Brady had "singl[ed] out" Plaintiff and the other EEO complainants by issuing the notice. *See* Slimak Aff. p. 6, attached to Slimak Dep. as MS-53. The letter of warning, however, was rescinded by Brady, and it was never placed in Plaintiff's personnel folder.[37] *See* Email from Randy Brady to Thomas Mccurdy of July 11, 2001, attached to Brady Dep. as RB-46; Email from Randy Brady to Jane Caldwell of June 8, 2001, attached to Brady Dep. as Ex. RB-27; Brady Dep. p. 279, lines 19-25. Therefore, the letter of warning from Brady did not constitute an adverse employment action taken against Plaintiff. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 650 (4th Cir.2002) (stating that disciplinary actions do not constitute adverse employment actions where the plaintiff "lost no pay and maintained the same position in the wake of [the] disciplinary actions, . . . which were later expunged from the record").

In sum, even construing all inferences in the light most favorable to Plaintiff, the court finds that there is no genuine issue of material fact as to whether Defendant retaliated against Plaintiff for her EEO filing. Thus, the court should grant summary judgment in favor of Defendant on Plaintiff's retaliation claim.

### Conclusion

For the foregoing reasons, **IT IS ORDERED** that Defendant's motion to strike is granted in part. Furthermore, **IT IS**

**RECOMMENDED** that Defendant's Motion for Summary Judgment (docket no. 22) be **GRANTED. IT IS ORDERED** that the parties stand down from final trial preparation unless directed otherwise by the district judge.

March 9, 2005.

---

36. The EPA maintains certain procedures for requesting procedures from on-site contractors. *See* Memo from Randy Brady to EPA Staff, attached to Brady Dep. as Ex. RB-17, CALD-00917.

37. According to Brady, the letter of warning was rescinded because Plaintiff and the other EEO complainants were being moved out of the building and "they would no longer be interacting with our contractor work force ... [s]o there was absolutely no reason to keep the letter of the notices of warning in effect ...." Brady Dep. p. 284, lines 9-17.