Filed: August 8, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 00-1650
(CA-98-147-7-F)

Christina Matvia,

Plaintiff - Appellant,

versus

Bald Head Island Management, Inc.,

Defendant - Appellee.

O R D E R

The court amends its opinion filed July 31, 2001, as follows:

On page 5, first paragraph, line 3 -- the citation to <u>Ellerth</u> is corrected to read "524 U.S. at 765."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

CHRISTINA MATVIA,
Plaintiff-Appellant,

v.

BALD HEAD ISLAND MANAGEMENT,
INCORPORATED,
Defendant-Appellee,

and

RICHARD TERBUSH,
Defendant.

No. 00-1650

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CA-98-147-7-F)

Argued: May 10, 2001

Decided: July 31, 2001

Before LUTTIG, MOTZ, and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Judge Traxler wrote the opinion, in
which Judge Luttig and Judge Motz joined.

_____

COUNSEL

ARGUED: John Edward Stember, Pittsburgh, Pennsylvania, for
Appellant. Kathleen DeLacy Head Pawlowski, Wilmington, North

Carolina, for Appellee. **ON BRIEF:** M. Travis Payne, EDELSTEIN & PAYNE, Raleigh, North Carolina, for Appellant.

_____

**OPINION**

TRAXLER, Circuit Judge:

Christina Matvia appeals from the grant of summary judgment in favor of Bald Head Island Management ("BHIM") on her claims of sexual harassment, retaliation, and constructive discharge. We affirm.

I.

On June 16, 1997, BHIM hired Matvia as a housekeeper. One month later, BHIM transferred Matvia to the position of Maintenance Worker I in the Contractor Service Village ("CSV"). Her supervisor at the CSV was Richard Terbush. Beginning in September 1997, Matvia became the recipient of unwanted attentions from Terbush:

*   Terbush approached Matvia, said he needed a hug, and proceeded to hug her;

*   Terbush told Matvia, who had just dyed her hair brown, that he would have to fantasize about a brunette rather than a blond;

*   Terbush informed Matvia that he no longer had sexual relations with his wife;

*   Terbush placed a pornographic picture on Matvia's desk;

*   Terbush told Matvia she looked good enough to eat;

*   Terbush frequently placed his arm around Matvia when they were riding in a golf cart and massaged her shoulder;

*   Terbush repeatedly told Matvia that he loved her and had a crush on her;

2

*    Terbush, on December 10, 1997, told Matvia that he had a dream
        that she sued him for sexual harassment and warned her that if she
        did bring suit she would be in big trouble; and

*    Terbush, five days after recounting his dream, pulled Matvia close
        to him in the golf cart, tried to kiss her, and struggled with Matvia
        until she was able to escape.

Matvia became physically ill after the attempted kiss and went home early. The next day Terbush told BHIM officials what had happened in the cart and was suspended pending an investigation. Matvia participated in the investigation and also pressed criminal charges against Terbush. On December 31, BHIM fired Terbush for sexually harassing Matvia.

While the harassment was ongoing, BHIM had in place a policy against sexual harassment. The policy is printed in the employee handbook which Matvia signed for at her orientation. The policy defines sexual harassment as "unwelcome or unwanted conduct of a sexual nature, whether verbal or physical." J.A. 565. Examples of sexual harassment are given, and employees are encouraged to report improper behavior to their supervisor, the personnel department, or the chief operating officer.

According to Matvia, after Terbush's termination co-workers and managers at BHIM altered their behavior towards her. Co-workers would move away if she sat near them on BHIM's buses or ferries; the bus drivers, who were often at the CSV, would stop talking among themselves when Matvia entered the room; the bus drivers traduced Matvia while on their routes; and members of management stopped saying "hello" to Matvia while waiting for the ferry.

Co-worker behavior aside, two other incidents caused Matvia stress after Terbush's termination. First, she applied for Terbush's supervisory position, was interviewed, but did not receive the job. Second, Matvia was disciplined for claiming an hour on her time sheet which she had not worked. The resulting stress caused Matvia to break out in a rash, and on February 26, 1998, Matvia took six weeks of medical leave but never returned to the job. In August 1998, Matvia filed suit against BHIM and Terbush, alleging a hostile work environment,

3

intentional infliction of emotional distress, assault and battery, retaliation, and constructive discharge. The district court dismissed the assault and battery claim and later entered an order dismissing Terbush from the suit. The court then granted summary judgment in favor of BHIM on the remaining claims. Matvia appeals the grant of summary judgment on the hostile work environment claim, the retaliation claim, and constructive discharge claim.

II.

A motion for summary judgment should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

To prevail on a Title VII hostile work environment claim, Matvia must establish four elements: (1) unwelcome conduct, (2) based on Matvia's gender, (3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment, and (4) some basis for imputing liability to BHIM. See Smith v. First Union Nat'l Bank, 202 F.3d 234, 241 (4th Cir. 2000). The district court assumed the first three elements had been established, but granted summary judgment on the fourth element in light of the affirmative defense outlined in Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998).

The affirmative defense of Faragher and Ellerth allows an employer to avoid strict liability for a supervisor's sexual harassment of an employee if no tangible employment action was taken against the employee. See Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765. Examples of tangible employment action include "discharge, demotion, or undesirable reassignment." Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765. If entitled to raise the affirmative defense, the employer must establish: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to

4

take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.

A. Tangible Employment Action

Matvia contends that the affirmative defense is not available because there was tangible employment action. However, Matvia was not discharged, demoted, or reassigned--in fact, during her tenure at BHIM she received a raise, promotion, and good evaluations. She claims that these positive events happened because she silently suffered Terbush's advances and therefore there was tangible employment action. See Brown v. Perry, 184 F.3d 388, 395 (4th Cir. 1999) (implying that receipt of a promotion can be a tangible employment action under Faragher and Ellerth).

However, in the present case there is no evidence that Matvia received benefits in exchange for acquiescing in Terbush's advances. Regarding Matvia's promotion from Maintenance Worker I to Maintenance Worker II and the accompanying increase in pay, Matvia testified that she and a co-worker received this status change because "we took on a lot more responsibilities" when the CSV began fuel sales. J.A. 461. Terbush, according to Matvia's testimony, "thought that me and the other worker should receive more because we were doing more work." J.A. 462. Indeed, in requesting that his subordinates be reclassified to the category of Maintenance Worker II, Terbush observed that "these employees are woefully underpaid" in light of their additional responsibilities. J.A. 36. Clearly, the promotion and raise were not unique to Matvia--the other worker Terbush supervised received the same benefit. Moreover, Matvia never alleged that Terbush offered her the promotion and pay increase in exchange for sexual favors. Matvia's own testimony indicates that these benefits were conferred because she and her colleague acquired additional responsibilities. Hence, the raise and promotion do not amount to tangible employment action.

Similarly, the evaluations indicating that Matvia was performing at a "satisfactory" level and that her employment should be continued do not amount to tangible employment actions. J.A. 38-39. There are no allegations that Terbush promised Matvia a satisfactory evaluation in

5

exchange for sexual favors, or that Matvia was performing at an unsatisfactory level but received a satisfactory rating in exchange for her tolerance of Terbush's unwelcome conduct. The evaluations were routine matters and cannot operate to prevent BHIM from raising the affirmative defense.

In sum, there was no tangible employment action in this case. While Matvia is entitled to all reasonable inferences from the evidence, her theory of "silent sufferance" would transform any ordinary employment action into tangible employment action. For example, under her theory, so long as sexual harassment is present, an upgrade in equipment used by the employee, a grant of sick leave, or any other mundane, non-adverse action would constitute tangible employment action and thus deprive the employer of the affirmative defense. Faragher and Ellerth simply do not lend themselves to a result that would make a grant of summary judgment in favor of the employer an impossibility. See Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 182 n.* (4th Cir. 1998) (observing that Faragher and Ellerth "in no way indicate that a variation from the normal requirements of Rule 56 is appropriate or that grants of summary judgment will be infrequent"). Of course, this does not mean that the affirmative defense is available when supervisors guilty of sexual harassment do bestow benefits in exchange for an employee's silence. However, in the present case there is no evidence that Matvia received her pay increase, promotion, or satisfactory evaluations in exchange for refraining from reporting the unwelcome conduct. Accordingly, BHIM is entitled to raise the affirmative defense outlined in Faragher and Ellerth. See Faragher, 524 U.S. at 807-08; Ellerth, 524 U.S. at 764-65.

B. Prevention and Correction of Improper Behavior

Matvia argues that BHIM did not take reasonable care to prevent and correct sexually harassing behavior because BHIM's anti-harassment policy was not an effective preventative program. Our cases have held that dissemination of "an effective anti-harassment policy provides compelling proof" that an employer has exercised reasonable care to prevent and correct sexual harassment. Lissau, 159 F.3d at 182. Evidence showing that the employer implemented the policy in bad faith or was deficient in enforcing the policy will rebut this proof. See Brown, 184 F.3d at 396.

6

Matvia does not allege that the policy was implemented in bad faith, but rather argues that it was deficient because BHIM employees did not understand it. Tellingly, Matvia points to no language in the policy rendering it ambiguous or difficult to follow. Nor does she suggest how the policy against sexual harassment could have been made any clearer. Her only evidence of the alleged deficiency is deposition testimony in which BHIM employees had trouble recalling the details of their orientation briefings. For example, Catherine Walkosz, one of the bus drivers, remembered viewing a video tape, but could not recall if there was a presentation from anyone in human resources. Of course, Walkosz had been hired in the spring of 1996 and the deposition took place in the summer of 1999. Consequently, when propounding questions about the orientation, counsel for Matvia prefaced his inquiry by stating that he realized "this is some ancient history." J.A. 195.

The failure to recollect the details of an orientation session does not mean that the employee does not understand the sexual harassment policy. Matvia's reasoning here presents a classic nonsequitur. Nonetheless, when counsel asked Walkosz whether she believed that Terbush should have been terminated for his conduct toward Matvia, Walkosz evinced understanding of the policy, responded in the affirmative, and opined that Terbush had violated rules set forth "in the handbook" that prohibited "[s]exual harassment." J.A. 211. The record also contains numerous affidavits from BHIM employees indicating an awareness of the policy against sexual harassment and the company officials to whom harassment could be reported. In the face of a policy that clearly defines sexual harassment and to whom harassment should be reported, Matvia cannot survive summary judgment by claiming that employees failed to recall their orientation briefings. Hence, Matvia's contention that BHIM lacked an effective preventative program must fail.

As for correction of sexually harassing behavior, BHIM suspended Terbush without pay four days after he attempted to kiss Matvia. Twelve days later, after completing an investigation, BHIM terminated Terbush. As this sequence of events indicates, shortly after it learned of Terbush's improper conduct, BHIM took prompt corrective action as required by Faragher and Ellerth.

7

Questioning the adequacy of BHIM's corrective action, Matvia focuses her arguments not on BHIM's suspension and termination of Terbush, but on the ostracism she suffered at the hands of the bus drivers and others. The first prong of the affirmative defense, however, focuses on the employer's exercise of "reasonable care to prevent and correct promptly any <u>sexually harassing behavior</u>." <u>Faragher</u>, 524 U.S. at 807 (emphasis added); <u>Ellerth</u>, 524 U.S. 765 (emphasis added). Matvia alleges no sexually harassing behavior occurring after the date of the attempted kiss. Though co-workers were often uncivil towards Matvia, they did not sexually harass her. Accordingly, BHIM's response to the ostracism and vilification of Matvia, which was bereft of a sexual component, is irrelevant to the first prong of the affirmative defense.

C. <u>Failure to Take Advantage of Preventative</u>
<u>or Corrective Opportunities</u>

Matvia argues that her reluctance to report Terbush's conduct was not unreasonable. According to circuit precedent,"evidence that the plaintiff failed to utilize the company's complaint procedure will normally suffice to satisfy [the company's] burden under the second element of the defense." <u>Barrett v. Applied Radiant Energy Corp.</u>, 240 F.3d 262, 267 (4th Cir. 2001) (internal quotation marks omitted) (alteration in original). If Title VII's prohibitions against sexual harassment are to be effective, employees must report improper behavior to company officials. <u>See Faragher</u>, 524 U.S. at 806 (observing "that a victim [of sexual harassment] has a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute") (internal quotation marks omitted); <u>Parkins v. Civil Constructors, Inc.</u>, 163 F.3d 1027, 1038 (7th Cir. 1998) (observing that "the law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists") (internal quotation marks omitted). Otherwise, the harasser's conduct would continue, perhaps leading other employees to infer that such behavior is acceptable in the workplace. <u>See Barrett</u>, 240 F.3d at 267.

Matvia contends that she needed time to collect evidence against Terbush so company officials would believe her. But <u>Faragher</u> and

8

Ellerth command that a victim of sexual harassment report the misconduct, not investigate, gather evidence, and then approach company officials. See Faragher, 524 U.S. at 807; Ellerth, 524 U.S. 765. Sexual harassment cases often involve the word of the harasser versus the word of the harassed employee, but this is no different from any other case where the outcome depends on the credibility of the parties' testimony. Though we understand why Matvia would want tangible evidence to buttress her version of events, this cannot excuse her failure to report Terbush's unwelcome conduct.

Matvia also argues that it was proper to refrain from reporting Terbush so she could determine whether he was a "predator" or merely an "interested man" who could be politely rebuffed. According to Matvia, she discovered that Terbush was a predator just days before the attempted kiss in the golf cart and consequently she should not be penalized for failing to take preventative or corrective action. We disagree. As an initial matter, our case law makes no distinction between "predators" and "interested men." So long as the conduct is unwelcome, based on the employee's gender, and sufficiently pervasive or severe to alter the conditions of employment, the label given to the harasser is immaterial. Moreover, even if we were to use Matvia's proffered nomenclature, the gravity and numerosity of the incidents make clear that Terbush was not merely an interested man who could be politely rebuffed. Matvia informed Terbush that her husband would not appreciate his conduct and she often turned her back to him and left the room when Terbush's actions or comments made her feel uncomfortable. Nonetheless, Terbush persisted in harassing her. In light of this long-term and persistent harassment, Matvia cannot be excused from failing to report Terbush to BHIM officials.

Next, Matvia points to the actions of the bus drivers and argues that she reasonably feared retaliation from co-employees. Without question, the reporting of sexual harassment can place "the harassed employee in an awkward and uncomfortable situation." Barrett, 240 F.3d at 268. Not only is it embarrassing to discuss such matters with company officials, but after the harassed employee overcomes this hurdle she may have to deal with a negative reaction from co-workers. While such events might cause an employee stress, the unpleasantness cannot override the duty to report sexual harassment. See Parkins, 163 F.3d at 1038. The reporting requirement is so essen-

9

tial to the law of sexual harassment that we "have refused to recognize a nebulous fear of retaliation as a basis for remaining silent." Barrett, 240 F.3d at 267 (internal quotation marks omitted). The bringing of a retaliation claim, see 42 U.S.C.A. § 2000e-3(a) (West 1994), rather than failing to report sexual harassment, is the proper method for dealing with retaliatory acts. Consequently, Matvia's fear that her co-workers would react negatively is insufficient to deprive BHIM of the affirmative defense.

Finally, Matvia argues that the attempted kiss alone should be considered in assessing the hostility of her work environment, and because she contacted BHIM soon after the incident, BHIM cannot as a matter of law establish that Matvia unreasonably failed to invoke the company's anti-harassment policy. From the filing of her complaint, Matvia has characterized the inappropriate behavior as beginning "[a]fter Terbush became Plaintiff's supervisor." J.A. 14. In an effort to avoid the affirmative defense set forth in Faragher and Ellerth, Matvia now asks this court to ignore the numerous incidents of sexual harassment enumerated in her complaint and discussed in her deposition testimony, and to instead focus only on the final indignity she suffered. This we cannot do. The evidence reveals a pattern of behavior beginning in September 1997 and ending December 15. The only way we can assess whether Matvia "failed to take advantage of any preventative or corrective opportunities provided by the employer," Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765, is to examine Matvia's actions from the time the unwelcome conduct began. Matvia's pick-and-choose method would make a mockery of this inquiry and would violate the basic tenets of fairness.

In short, though Terbush's advances began in September 1997 and ended on December 15, BHIM did not learn of the harassment until December 16. BHIM had an effective anti-harassment policy in place that Matvia failed to utilize. Hence, BHIM has established the second prong of the affirmative defense.

III.

Matvia contends that BHIM retaliated against her for reporting sexual harassment. To prove a prima facie case of retaliation, Matvia must show that "(1) she engaged in a protected activity; (2) the

10

employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001). Once Matvia establishes the elements of her prima facie case, the burden shifts to BHIM to proffer evidence of a legitimate, non-discriminatory reason for taking the adverse employment action. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the employer carries its burden,"the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered" were pretextual. Id. As recently noted by the Supreme Court, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2109 (2000) (emphasis added).

Because of her participation in the sexual harassment investigation, Matvia alleges that BHIM retaliated against her by (1) declining to promote her to Terbush's supervisory position, (2) failing to take action to stop co-workers from ostracizing and vilifying her, and (3) disciplining her for claiming on her time card an hour she had not worked.

Turning first to the decision to offer Terbush's managerial position to Theodore Goebel rather than Matvia, the district court correctly concluded that because this decision was made a short time after the harassment investigation, Matvia had established a prima facie case. See Von Gunten, 243 F.3d. at 865 (noting that a refusal to promote can constitute adverse employment action); Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 443 (4th Cir. 1998) (observing that "the closeness in time between" the protected activity and the adverse employment action is sufficient to "make a prima facie case of causality") (internal quotation marks omitted). In offering a legitimate, non-discriminatory reason for its actions, BHIM points out that James W. Fulton, who was in charge of hiring a candidate to fill Terbush's position, ranked each applicant based on ten job-related criteria and that Goebel scored fifteen points higher than Matvia and four points higher than the next most qualified candidate. Goebel also had prior budget and office experience and had managed a motor pool in the

11

army for many years. Matvia, on the other hand, had no budget or managerial experience.

In attempting to cast BHIM's nondiscriminatory reasons as pretextual, Matvia claims that she had successfully served as interim manager after Terbush's termination and thus she should have gotten the job. At deposition, however, Matvia admitted that she had not performed many of the key functions of the job such as preparing budgets, reporting on budgets, preparing performance evaluations, approving invoices for payment, and making corrections on time cards. In addition, Matvia testified that Fulton never said or did anything to make her think that her participation in the investigation of Terbush played a role in the choice of Goebel to fill Terbush's position. Hence, Matvia offers no evidence that BHIM's reasons for hiring Goebel instead of her were pretextual.

Second, Matvia's claim of retaliation based on the uncivility of co-workers, most of which constituted refusals to speak to her, must fail because Matvia cannot establish that she suffered adverse employment action. In Munday v. Waste Management, Inc., 126 F.3d 239 (4th Cir. 1997), we noted that "[i]n no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity." Id. at 243. The alleged adverse employment action in this case is far less egregious than that discussed in Munday. In the present case, Matvia does not allege that BHIM instructed her co-workers to ostracize her; rather she simply alleges that BHIM failed to correct the co-workers' behavior. Under Munday, this cannot constitute adverse employment action. See also Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997) (holding that personal animus by employees and supervisors toward plaintiff could not as a matter of law be considered an adverse employment action). Despite Matvia's arguments to the contrary, ordinary workplace strife of the kind present in this case cannot constitute adverse employment action.

Finally, Matvia points to the charge of falsification of time records as evidence of retaliation. At the time of this incident, Matvia was attending physical therapy for a shoulder injury and thus was leaving work at odd hours. One week she claimed to have worked one hour

12

more than she actually worked and was counseled for falsifying time records. Matvia admits that the time sheet she turned in was incorrect; therefore, she cannot argue that she suffered adverse employment action by being disciplined under BHIM's general rule requiring accurate reporting of hours worked. See Von Gunten, 243 F.3d at 869 ("[T]erms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment polices or exemption from . . . disciplinary procedures.").

Matvia also argues that the manner in which BHIM implemented its policy regarding accurate time cards and disciplinary policies against her constitutes adverse employment action. She asserts that only repeat offenders were charged with falsification of time records. In Von Gunten, we dealt with the same contention, and held that the manner in which an employer implements a disciplinary policy "might be evidence of pretext, but is not evidence of adverse employment action." Id. Accordingly, Matvia did not establish a prima facie case of retaliation based on the charge of falsifying time records.

IV.

Matvia also claims that she was constructively discharged because of the sexual harassment complaint. To establish constructive discharge, Matvia must show that BHIM deliberately made her working conditions "`intolerable' in an effort to induce[her] to quit." Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1354 (4th Cir. 1995). "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit." Taylor v. Virginia Union Univ., 193 F.3d 219, 237 (4th Cir. 1999) (en banc), cert. denied, 528 U.S. 1189 (2000). When measuring the tolerability of working conditions, courts must employ an objective standard. See id.

Matvia again alleges that BHIM encouraged co-worker retaliation in an effort to force her to resign. The record, however, reveals no deliberate efforts on the part of BHIM to make Matvia's work environment unpleasant or intolerable. On the contrary, the record is replete with instances of management's attempts to persuade co-workers to be civil towards Matvia. For example, on several occasions BHIM's director of personnel advised the bus drivers "that they

13

would have to work together with [Matvia] and that they would have to be civil to each other in the work place." J.A. 116. As additional evidence of deliberate actions, Matvia points to BHIM's decision not to promote her to Terbush's old position and the charge of falsification of time records. As discussed in the previous section, there was nothing improper in BHIM's handling of either of these situations. Accordingly, there is no evidence of a deliberate attempt to make Matvia's working conditions intolerable.

Of course, even if we could infer deliberate conduct from the evidence, Matvia's claim would fail on the intolerability prong. This court has previously held that "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994). Hence, the co-worker ostracism, denial of a management position, and the counseling received for turning in an inaccurate time card would not have compelled the reasonable person to resign. These incidents might have made the workplace less enjoyable for a reasonable person, but not intolerable.

V.

For the foregoing reasons, we affirm the district court's decision granting summary judgment to BHIM on Matvia's claims of sexual harassment, retaliation, and constructive discharge.

AFFIRMED

14