KING, Circuit Judge,
dissenting:
My colleagues of the panel majority have today concluded that, as a matter of law, it was not reasonable for an African-American employee to think that the on-the-job remark made by his IBM co-worker — “[t]hey should put those two black monkeys in a cage with a bunch of black apes and let the apes fuck them” — warranted being reported to his employers as a potential Title VII violation. And, in the majority’s view, Plaintiff Robert Jordan has not sufficiently alleged that IBM’s decision to fire him for making that report was racially motivated. I disagree and write separately to elaborate on my position. First, in ruling that Jordan has not stated a Title VII retaliation claim, the majority has misconstrued the facts and misapplied the law, placing employees who experience racially discriminatory conduct in a classic “Catch-22” situation. Second, its conclusion that Jordan has not stated a claim of a racially discriminatory discharge is contrary to controlling Supreme Court precedent.[1]
I.
This proceeding is on appeal after having been dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In reviewing such a ruling, we are obliged to accept the facts alleged by Jordan as true, and review those allegations in the light most favorable to him. See Lambeth v. Bd. of Comm’rs, 407 F.3d 266, 268 (4th Cir.2005). A proper application of these principles undermines the majority’s decision in this case.
In October 2002, Jordan, an employee of IBM and ARC since December 1998, was standing near his IBM co-worker, Jay Farjah, in a television room at their IBM worksite in Maryland. Amend. Compl. ¶ 9.[2] They were watching reports on the cap *350 ture of two snipers (both African-American) who had terrorized the Washington, D.C. area that fall. Id. As they watched, Farjah loudly stated his position that “[t]hey should put those two black monkeys in a cage with a bunch of black apes and let the apes fuck them” (the “ ‘black monkeys’ comment”). Id. Immediately after Farjah made the “black monkeys” comment, Jordan reported it to other coworkers. Id-¶ 10. Two of those co-workers related to Jordan that “they had heard Farjah make similar offensive comments many times before.” Id. Armed with this knowledge, and pursuant to IBM’s policy that its employees were obliged to report racially discriminatory conduct to management, Jordan advised C.J. Huang and Mary Ellen Gillard, two of his IBM managers, of the “black monkeys” comment. Id. at ¶¶ 11-12. When Jordan requested that the IBM managers speak with Farjah and tell him “not to make such comments,” the IBM managers directed Jordan to put the “black monkeys” comment in writing (and he obliged). Id. at ¶ 12. Huang then asked Jordan if he had considered the impact that his complaint might have on Farjah, and suggested that “Farjah may have been joking.” Id. at ¶ 13.
Thereafter, Ms. Gillard reported to Jordan that Farjah admitted to having said “they should put those two monkeys in a cage,” but that he denied having made the balance of his “black monkeys” comment. Amend. Compl. ¶ 15. Jordan then advised Gillard that he wanted to bring his complaint to the attention of Ron Thompson, IBM’s site manager. Id. Jordan also discussed the comment with Sheri Mathers, an ARC manager. Id. at ¶ 14.
Jordan’s working conditions took a downward turn immediately after he reported Farjah’s “black monkeys” comment to IBM management. Amend. Compl. ¶ 16. Prior to reporting the comment, Jordan had been authorized to start his work day at 6:30 a.m., which permitted him to pick up his son after school. Id. Without notice or explanation, Gillard changed Jordan’s work schedule, requiring him to report to work at -9:00 a.m. each day, thereby precluding him from picking up his son from school. Id. Jordan also received a sudden increase in his workload. Id. at ¶ 17. And at the office Thanksgiving party, “Huang made a crude, derogatory remark and gesture to Jordan.” Id. Then, on November 21, 2002 — about a month after he first complained to IBM’s managers of Farjah’s “black monkeys” comment — Jordan was fired from his job, at IBM’s request. Id. at ¶ 19. According to the allegations, IBM had Jordan fired “because of his opposition to Farjah’s racially offensive statement.” Id. at ¶ 20. Furthermore, IBM’s decision to retaliate against Jordan was made “because he is African-American,” and his “race was a motivating factor.” Id. at ¶ 42.
II.
To begin with, the severity of Farjah’s racially hostile “black monkeys” comment merits our consideration. It is plain that a reference to our African-American fellow citizens as “monkeys” reflects the speaker’s deep hostility towards them — on the sole basis of their color. And it is equally clear that such comments constitute profound insults to our friends in the African-American community. By referring to African-Americans as “monkeys,” the speaker plays on historic, bigoted stereotypes that have characterized them as uncivilized, non-human creatures who are intellectually and culturally inferior to whites. See, e.g., Jennifer M. Russell, On Being a Gorilla in Your Midst, or, the Life of One Blackwoman in the Legal Academy, 28 Harv. C.R.-C.L. L.Rev. 259, 260 (1993) (discussing message conveyed by gorilla picture placed anonymously in mailbox of African-American law professor: “ ‘Claim *351 no membership to the human race. You are not even a subspecies. You are of a different species altogether. A brute. Animal, not human.’ ”).[3] Indeed, our Court probably understated the impact of such racially charged references in recently observing that “ ‘[t]o suggest that a human being’s physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.’ ” White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 (4th Cir.2004) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir.2001)).
In his “black monkeys” comment, Farjah openly opined that the “black monkeys” should be put in a “cage with a bunch of black apes” so that the “apes” could “fuck them.” While we must endeavor to do so, our panel is scarcely qualified to comprehend the impact such a remark would have on the reasonable African-American listener. Suffice it to say that, in a single breath, Farjah equated African-Americans with “black monkeys” and “black apes,” and implied a savage, bestial sexual predilection acutely insulting to members of the African-American community.
III.
In this case, Jordan contends, inter alia, that IBM and ARC fired him for reporting Farjah’s “black monkeys” comment to IBM’s managers, and that his firing contravened Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C. §§ 2000e to 2000e-17). The district court ruled that his Complaint and Amended Complaint each failed to state a claim of Title VII retaliation. On appeal, the primary issue we face is whether Jordan has alleged facts sufficient to show that, in reporting the “black monkeys” comment to IBM management, he was engaged in a Title VII protected activity.
Jordan maintains that, in reporting the “black monkeys” comment to IBM and ARC, he was reasonably opposing a potential racially hostile work environment. Title VII has been consistently interpreted as prohibiting conduct that is “so severe or pervasive as to alter the conditions of the victim’s employment and create an abusive working environment.” Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks and alteration omitted). A hostile work environment is unique among the employment practices that contravene Title VII, in that such an environment normally develops through a series of separate acts, which might not, standing alone, violate Title VII. Indeed, such an environment is usually the sum of several parts. See Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). And whether a hostile work environment exists in fact can be a bit of a moving target; there is no “mathematically precise test.” See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S.Ct. 367,126 L.Ed.2d 295 (1993).
An employee who opposes a hostile work environment is engaged in a “protected activity” and cannot be retaliated against. *352 See Title VII § 704(a), 42 U.S.C. § 2000e-3(a).[4] The Supreme Court emphasized in June of this year that “Title VII depends for its enforcement upon the cooperation of employees,” and that “effective enforcement [of Title VII] could thus only be expected if employees felt free to approach officials with their grievances.” Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. -, 126 S.Ct. 2405, 2414, 165 L.Ed.2d 345 (2006)(internal quotation marks omitted). According to the Court, “[i]nterpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of [Title VIPs] primary objective” — preventing harm — “depends.” Id.
And we have recognized that a plaintiff pursuing a Title VII retaliation claim need not show that the activity he opposed has, in fact, contravened some aspect of Title VII. Rather, he must simply have a reasonable belief that Title VII has been — or is in the process of being — violated by the activity being opposed. See EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406-07 (4th Cir.2005); see also Peters v. Jenney, 327 F.3d 307, 320 (4th Cir.2003) (concluding, in reliance on decisions under Title VII, that “to show ‘protected activity,’ the plaintiff in a Title VI retaliation case need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring” (internal quotation marks and alteration omitted)). Accordingly, we are obliged to vacate the district court’s ruling if Jordan was engaged in a protected activity when he complained to IBM, i.e., if he reasonably believed that Title VII was being contravened when Farjah made his “black monkeys” comment.
. In the majority’s view, Jordan is not protected by Title VII, and IBM and ARC were thus free to fire him for reporting Farjah’s “black monkeys” comment. The majority’s conclusion on this point, however, relies on its misapprehension of Jordan’s allegations and its misapplication of the controlling legal principles. As a result, its decision has placed employees like Jordan in an untenable position, requiring them to report racially hostile conduct, but leaving them entirely at the employer’s mercy when they do so.
A.
The majority maintains that no reasonable person could believe that Farjah’s racially charged conduct would continue, because it was “a single abhorrent slur prompted by — though not excused by — a breaking news report.” See ante at 341. On this basis, it concludes that “Jordan rests his case on the assumption that Farjah would repeat the remarks that he made on October 23 more frequently than his past history indicates.” Id. at 341. The majority’s position, however, cannot be reconciled with the allegations of the Amended Complaint.
Our inquiry must focus on Jordan, and whether it was reasonable for him to believe that Title VII was in the process of being violated when Farjah’s “black monkeys” comment was made. See Navy Fed., 424 F.3d at 406-07; Peters, 327 F.3d at 320. Even if the “black monkeys” comment was prompted by a news report and not specifically aimed at Jordan or anyone else in the room, a reasonable person could readily conclude that, if not confronted, Farjah’s conduct would continue unabated, altering the working conditions of IBM’s African-American employees. In *353 deed, Farjah apparently offered no apology or explanation (such as that supplied today by the majority) to manifest any remorse or regret for having made his “black monkeys” comment. Responding to such blatant and unabashed racism in his workplace, Jordan “immediately reported [Farjah’s] remark to several coworkers,” and at least two of them advised Jordan “that they had heard Farjah make similar offensive comments many times before.” Amend. Compl. ¶ 10 (emphasis added). That information confirmed Jordan’s initial concerns, thereby providing substantial (and ample) support for his reasonable conclusion that African-American workers at IBM’s facility were regularly exposed to conduct akin to the “black monkeys” comment, and that such conduct would continue unless Farjah was confronted.
In the majority’s view, the information provided by Jordan’s co-workers, coupled with the “black monkeys” comment, did not allow Jordan to reasonably believe that Farjah’s conduct would be repeated. As the majority sees it, a reasonable person could not make heads or tails out of what his co-workers meant because (1) Jordan had not experienced the other comments personally, and (2) he “did not know about where or when such statements were made, or what Farjah said except that the statements were similar.” Ante at 341. Taking the co-workers’ reports at face value, however, nothing was vague — Farjah had openly referred to African-Americans as “black monkeys,” and he had made “similar offensive comments many times before.” Amend. Compl. ¶¶ 9-10. That the specific content, dates, and conditions of Farjah’s earlier offensive remarks may not have been communicated to Jordan is beside the point. The reasonable employee — like Jordan, an African-American — ■ would have no need to question his coworkers to determine that Farjah had previously voiced racially hostile comments, and that he was likely to continue doing so. Cf. Matvia v. Bald Head Island Mgmt, Inc., 259 F.3d 261, 269 (4th Cir.2001) (recognizing that victim of harassment is commanded to “report the misconduct, not investigate, gather evidence, and then approach company officials”). Accepting Jordan’s allegations as true, he possessed an objectively valid basis for believing that Farjah had made comments of “similar offens[e]” to his “black monkeys” comment “many times before.” See Amend. Compl. ¶ 10. Jordan was thus entitled to conclude that what he had witnessed and heard in the television room was simply “par for the course.”
Moreover, Farjah’s “black monkeys” comment opened a window into his soul, revealing to Jordan a racial animus as ignorant as it was virulent. It is, in my view, entirely reasonable to believe that a person who — even in a moment of extreme frustration — equates African-Americans with “black monkeys” and “black apes,” and implies that they have a bestial sexual appetite, possesses a deep disdain for the entire black community and would likely repeat his offending conduct.
B.
Next, as a matter of law, I do not subscribe to the majority’s view that, pursuant to Navy Federal, an employee lacks Title VII protection for reporting racially charged conduct, unless he has “an objectively reasonable belief that a violation is actually occurring.” See ante at 340. On this point, the majority implies that the employee cannot meet that burden without allegations that “a plan was in motion to create [a hostile work] environment.” Id. This position is simply incorrect, for at least two reasons. First, requiring an employee to show that a hostile work environment was being planned imagines a fanciful world where bigots announce their *354 intentions to repeatedly belittle racial minorities at the outset, and it ignores the possibility that a hostile work environment could evolve without some specific intention to alter the working conditions of African-Americans through racial harassment. Second, and relatedly, it fails to take into account the cumulative nature of a hostile work environment, and is thus at odds with the broad application of Title VII’s anti-retaliation provision prescribed by the Supreme Court.
As the majority observes, the Supreme Court has treated hostile work environment claims in a way that accounts for their unique, additive character. In Morgan, the Court observed that “[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one ‘unlawful employment practice.’ ” See 536 U.S. at 117, 122 S.Ct. 2061. It instructed that Title VII “does not separate individual acts that are part of the hostile environment claim from the whole.” Id. at 118, 122 S.Ct. 2061. And the Court has recognized that an employer is entitled to assert — -in order to avoid vicarious liability — the affirmative “Ellerth/Faragher defense” based in part on an employee’s unreasonable failure to head off a hostile work environment’s evolution. See Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).
The Ellerth/Faragher defense, in essence, imposes a duty on an employee to report harassing and offensive conduct to his employer. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir.2001) (recognizing employee’s “duty ... to alert the employer to the allegedly hostile environment” (internal quotation marks omitted)). That duty is intended to further Title VII’s “primary objective” of avoiding harm, rather than redressing it. Faragher, 524 U.S. at 806, 118 S.Ct. 2275. The Ellerth/Faragher defense thus stands for the proposition that an employee who unreasonably fails to report racially hostile conduct cannot pursue a hostile work environment claim because, by his silence, he was complicit in the conduct. See id. at 806-07,118 S.Ct. 2275.
Ignoring the Supreme Court’s recent directive that Title VII’s anti-retaliation provision be broadly construed, see White, 126 S.Ct. at 2414, the majority applies that provision narrowly and restrictively, failing to account for the cumulative nature of a hostile work environment. When the cumulative nature of such an environment is properly considered, it is clear that employees are protected under Title VII from employer retaliation if they oppose conduct that, if repeated, could amount to a hostile work environment. See Alexander v. Gerhardt Enterprises, Inc., 40 F.3d 187, 190, 195-96 (7th Cir.1994) (concluding that employee had reasonable, good-faith belief that Title VII violation was in progress when co-worker, on single occasion, said “if a nigger can do it, anybody can do it,” and apologized shortly thereafter).
By opposing racially charged conduct that he reasonably believes could be part and parcel of a hostile work environment, a reporting employee has opposed the impermissible whole, even absent an independent basis for believing the conduct might be repeated. See Faragher, 524 U.S. at 806-07, 118 S.Ct. 2275; see also Morgan, 536 U.S. at 117, 122 S.Ct. 2061. Indeed, in applying the Ellerth/Faragher defense, we require employees to report such incidents in order to prevent hostile work environments from coming into being. See Matvia, 259 F.3d at 269 (“Faragher and Ellerth command that a victim of ... harassment report the misconduct, not investigate, gather evidence, and then approach company officials.”); Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 182 (4th Cir.1998) (“[A]ny evidence that *355 [the employee] failed to utilize [the company’s] complaint procedure will normally suffice to satisfy its burden under the second element of the [Ellerth/Faragher\ defense.” (internal quotation marks and alteration omitted)). Only a tortured reading of Title VII can validate the proposition that an employee who has taken a step necessary to avoid complicity in a Title VII violation has not “opposed any practice made an unlawful employment practice.” § 2000e-3(a). Indeed, in Barrett, we recognized that an employee’s “generalized fear of retaliation does not excuse a failure to report” harassing conduct, because “Title VII expressly prohibits any retaliation against [employees] for reporting ... harassment.” See 240 F.3d at 267.
Without question, Farjah’s “black monkeys” comment is the stuff of which a racially hostile work environment is made. See White v. BFI Waste Servs., LLC, 375 F.3d 288, 297-98 (4th Cir.2004) (recognizing pervasive use of terms including “boy,” “jigaboo,” “nigger,” “porch monkey,” “Mighty Joe Young,” and “Zulu warrior” created triable issue of fact on hostile work environment claim); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 182, 185-86 (4th Cir.2001) (same for repeated use of racial slurs, including “niggers,” “monkeys,” and “black bitch”). On the allegations here, it was entirely reasonable for Jordan to believe that, in reporting the racially charged “black monkeys” comment to his employers, he was opposing a racially hostile work environment. IBM and ARC nonetheless fired him — for simply reporting this outrageous comment to them — and they thereby contravened his Title VII right s.[5]
C.
As a result of today’s decision, employees in this Circuit who experience racially harassing conduct are faced with a “Catch-22.” They may report such conduct to their employer at their peril (as Jordan did), or they may remain quiet and work in a racially hostile and degrading work environment, with no legal recourse beyond resignation. Of course, the essential purpose of Title VII is to avoid such situations.
The majority maintains that “Jordan’s dilemma, that the law is inconsistent by both encouraging and discouraging ‘early’ reporting, is presented too abstractly.” Ante at 342. In my view, however, one need not venture into abstractions; as our Title VII jurisprudence now stands, Farjah’s comment thrust Jordan into the narrows between Scylla and Charybdis.[6] By our Matvia decision, we actually “command[ed]” Jordan to report the “black monkeys” comment, “not investigate, gather evidence, and then approach company officials.” See 259 F.3d at 269. And we explained that a fear of retaliation by IBM would not excuse his reporting duty, because such retaliation is expressly prohibited by Title VII. See id. at 270 (“The bringing of a retaliation claim, rather than *356 failing to report ... harassment, is the proper method for dealing with retaliatory acts.” (citation omitted)). Jordan thus acted at our command and with our offer of protection, but he has nevertheless been denied our promised lifeline, and has been left entirely vulnerable.
If Jordan, when he experienced the “black monkeys” comment, could have foreseen the course of events that would unfold, he would have recognized that— aside from immediately filing an EEOC complaint — -he had but two choices. He could remain silent, in direct defiance of this Court’s commandment to report racially charged conduct as soon as it occurs (thereby allowing Farjah’s pattern of conduct to continue unchallenged, and forfeiting any judicial remedy he might have); or he could risk his career in an effort to attack the racist cancer in his workplace. Jordan thus speaks from experience when he contends that our Title VII jurisprudence is inconsistent by both encouraging and discouraging early reporting. The majority asserts that there is no conflict between the Ellerth/Faragher duty to report harassing conduct and the requirement that employees complaining of harassing conduct have a reasonable belief that Title VII is being violated by the challenged conduct. According to the majority, the two doctrines work in harmony: “Complaining employees are protected by Title VII once they have an objectively reasonable belief that a Title VII violation has occurred, and they have a reasonable amount of time in which to bring their concerns to their employers’ attention.” Ante at 342 - 343.[7] The foregoing proposition, however, is only valid if, as I have contended, employees are always protected by Title VII’s anti-retaliation provision whenever they are obliged to report improper conduct under the Ellerth/Faragher defense, as otherwise some employees will be commanded to report such conduct at their peril.
Yet, if Title VII protects all employees who comply with the Ellerth/Faragher defense’s reporting duty, the majority’s decision is wrong. Although the “black monkeys” comment plainly required reporting under our controlling precedent, the majority rules today that Jordan was not protected by Title VII’s anti-retaliation provision when he reported it. Farjah’s “black monkeys” comment thus placed Jordan into the same legal vacuum that the majority asserts not to exist. And the employees in this Circuit, who are now compelled to choose between their livelihoods and their dignity, can surely take little comfort in the majority’s insistence that their dilemma “is presented too abstractly.” In the wake of the majority’s decision, there is simply no room for the employee cooperation the Supreme Court has just explained as being critical to Title VII’s effectiveness. See White, 126 S.Ct. at 2414.
The members of the majority further assert that the interplay between the Ellerth/Faragher defense, on the one hand, and the reasonable belief requirement embodied in our Title VII anti-retaliation jurisprudence, on the other, “is of limited applicability.” Ante at 343. This is so, they say, because the former concerns only an employee’s ability to bring suit, while the latter involves whether the employee can safely complain of harassing conduct. See id. And they offer their assurance that an employee who “loses his right to a judicial remedy under Matvia still has the incentive to report” racial harassment. Id.
*357 In authorizing private actions under Title VII, however, Congress exercised its considered judgment that such suits are an essential tool for ensuring compliance with Title VII’s provisions. And, as the Supreme Court has observed, the Title VII “anti-retaliation provision’s primary purpose” is “maintaining unfettered access to statutory remedial mechanisms.” White, 126 S.Ct. at 2412 (internal quotation marks and alteration omitted). With all respect to my fine colleagues of the majority, it is not for unelected judges to decide that Congress’s chosen remedy is unimportant, and that it may be effectively eviscerated by some judicially created “reasonable belief’ requirement.
Title VII protects an employee (such as Jordan) who reports harassing conduct under the reasonable belief that he is obliged to do so. And I disagree wholeheartedly with the majority’s contrary view.[8]
IV.
Finally, Jordan has adequately pleaded a claim of a racially discriminatory firing, in contravention of 42 U.S.C. § 1981. In concluding to the contrary, the majority has brought our jurisprudence into direct conflict with the Supreme Court’s unanimous decision in Swierkiewicz v. Sorema N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). In Swierkiewicz, the Court relied on the liberal pleading standard of Federal Rule of Civil Procedure 8(a) in concluding that an employment discrimination plaintiffs bare allegation that an adverse employment action had been taken “on account of’ a prohibited ground sufficiently alleges that the action was so motivated. See 534 U.S. at 514, 122 S.Ct. 992. Yet, the majority today rules that Jordan’s materially indistinguishable allegation (that he was fired “because he is African-American” and that his “race was a motivating factor,” Amend. Compl. ¶ 42) is insufficient to comply with Rule 8(a)’s notice pleading requirements.
In Sivierkiewicz, the Court unanimously reversed a decision of the Second Circuit, which required a plaintiff-employee to plead the specific facts necessary to establish a prima facie case of employment discrimination under the McDonnell Douglas framework. See 534 U.S. at 515, 122 S.Ct. 992. In so ruling, the Court reiterated that, in order to survive a Rule 12(b)(6) motion to dismiss in a civil action governed by Rule 8(a) (such as an employment discrimination action), a plaintiff need only “ ‘give the defendant fair notice of what the plaintiffs claim is and the grounds upon which it rests.’ ” Id. at 512, 122 S.Ct. 992 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).[9] And, as the Court observed, the “simpli *358 fied notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.” Id. The Court thus concluded that Swierkiewicz had stated valid claims of national origin and age discrimination, where his complaint “alleged that he had been terminated on account of his national origin ... and on account of his age,” and further “detailed the events leading to his termination.” Id. at 514, 122 S.Ct. 992.
Jordan has amply detailed the events leading to his improper termination (including the “black monkeys” comment, his consultation with co-workers, his report to unsympathetic supervisors, and the abrupt deterioration of his working conditions). And he has specifically alleged that he was fired for reporting Farjah’s “black monkeys” comment “because he is African-American,” and that his “race was a motivating factor” in his discharge. Amend. Compl. ¶ 42.[10] As such, he has plainly satisfied Rule 8(a)’s notice pleading requirement, and he has stated a claim upon which relief can be granted.
In affirming the district court’s dismissal of Jordan’s § 1981 racial discrimination claim, the majority today announces that, in order to comply with Rule 8(a), Jordan must detail — in his complaint — all of the specific facts from which a reasonable jury could conclude that race entered into IBM’s decision to fire him. Such a requirement simply cannot be reconciled, however, with the “fair notice” standard reiterated by the Court in Swierkiewicz, as it collapses into Rule 9(b)’s more rigorous requirement that causes of action for fraud or mistake be pleaded with particularity. See Swierkiewicz 534 U.S. at 513, 122 S.Ct. 992 (observing, in rejecting Second Circuit’s heightened pleading standard, that “[t]his Court ... has declined to extend [Rule 9(b)’s standard] to other contexts”).[11] Indeed, according to the majority, Jordan apparently must satisfy Rule 9(b)’s pleading standard in order to comply with Rule 8(a).[12]
*359 Jordan’s allegation that he was fired for reporting the “black monkeys” comment “because he is African-American” cannot be distinguished from Swierkiewicz’s allegations “that he had been terminated on account of his national origin” and “his age.” Even if Jordan has failed to allege the specific facts from which one could independently conclude that IBM was motivated by race when it retaliated against him, he has made the factual allegation that its decision was so motivated, and he has thus given IBM “ ‘fair notice of what [his § 1981 discrimination] claim is and the grounds upon which it rests.’ ” Swierkietuicz, 534 U.S. at 512, 122 S.Ct. 992. In concluding otherwise, the majority today brings us into direct conflict with Supreme Court precedent.[13]
Pursuant to the foregoing, I respectfully dissent.[14]

. By order of July 5, 2006, we unanimously granted panel rehearing, thereby vacating the panel majority's earlier decision, which had affirmed the district court's dismissal order, see Jordan v. Alternative Res. Corp., 447 F.3d 324 (4th Cir.2006), and from which I had dissented, see id. at 336 (King, J., dissenting). By its decision today, the majority has again affirmed the district court's dismissal order. In so doing, it has rewritten its earlier opinión to reduce the importance of the snipers' capture in its discussion of Jordan's Title VII claim (although the capture remains prominent in the majority’s analysis of that claim), and in an endeavor to further explain its decision concerning Jordan’s § 1981 discrimination claim, which had previously been relegated to two conclusory sentences, see id. at 334 (majority opinion). In these circumstances, I am disappointed that our panel rehearing has merely prolonged the decisional process, without altering the result reached.

. The district court denied as futile Jordan's motion to amend. In so ruling, however, the court considered the allegations of the Amended Complaint together with those of the Complaint. At oral argument, IBM conceded that the Amended Complaint's allegations are before us in this appeal.

. Professor D. Marvin. Jones, who has researched and written extensively on the subject, has observed that:
The Europeans ... equated "the unknown” with the uncivilized,' and uncivilized men with animals. Hence, it is not surprising that the early Roman historian Herodotus reported that Africa was filled with "dog eared men, and the headless that have eyes in their chests.” The historical record is replete with examples of Europeans attributing animal characteristics to blacks, culminating in controversial conjecture originating in ... seventeenth[-]century England that blacks had sprung from apes.
See D. Marvin Jones, Darkness Made Visible: Law, Metaphor, and the Racial Self, 82 Geo. L.J. 437, 466 (1993).

. In relevant part, Title VII, .at 42 U.S.C. § 2000e-3(a), prohibits an employer from discriminating against an employee “because he has opposed any practice made an unlawful employment practice by this subchapter.”

. Jordan has never requested that we, as the majority puts it, transform Title VII into a "statutory civility code.” See ante at 343. Indeed, he has never even contended that Title VII required IBM to discipline Farjah for making the "black monkeys” comment. Jordan asserts only that IBM cannot, consistent with Title VII, fire him for reporting the "black monkeys” comment.

. In Homer’s Odyssey, Odysseus is presented with a difficult choice: he must sail through straits that are bracketed by two monsters, and he is forced to navigate closer to one or the other. One choice, Scylla, is a six-headed creature who is certain to eat six of his crewman, while the other, Charybdis, spews forth a whirlpool that poses an uncertain risk to the entire ship and crew. On the advice of the sorceress Circe, Odysseus chose Scylla, and six of his men perished.

. Although I do not subscribe to the majority’s characterization of the Ellerth/Faragher reporting requirement as a "laches concept" that merely prohibits inordinate time delays between discriminatory or harassing conduct and reporting, see ante at 342, I accept it arguendo as it nonetheless fails to support the majority’s conclusion.

. Because Jordan’s other retaliation claims, alleged under 42 U.S.C. § 1981 and Montgomery County (Maryland) Code section 27-19, rely on the same legal principles as his Title VII retaliation claim, I also disagree with the majority’s ruling that those claims were properly dismissed.

. The majority asserts that the district court dismissed Jordan's § 1981 discrimination claim not because of a "failure to give notice of his claim,” but because "what was alleged failed to state a discrimination claim.” Ante at 346. By this, the majority is apparently drawing a distinction between a complaint that fails to give notice, in that it does not adequately disclose the nature of the plaintiff's claim, and a complaint that fails to state a claim, in that its alleged facts provide no legal basis for recovery. Jordan's allegations (that he is African-American, that he was fired, and that the former contributed to the latter), if true, plainly provide a basis for recovery under § 1981, and I do not read the majority opinion as holding that an employee may not recover under § 1981 if he has been fired on account of his race. Thus, the majority's conclusion can mean only that Jordan's allegation — that "race was a motivating factor” in his discharge — was insufficient to give IBM notice of his discrimination claim.

. In its ruling, the majority simply misapprehends the nature of Jordan’s discriminatory firing claim, asserting that "Jordan has not demonstrated how Farjah's racism could be imputed to the defendants.” Ante at 345. By his discrimination claim, Jordan essentially alleges that, in reaching its decision to retaliate against him for reporting the "black monkeys” comment, IBM concluded that, although a similarly situated white employee might be allowed to remain on staff, it could not tolerate a "rabble-rousing” African-American.

. The majority’s opinion fails to account for the distinction we have drawn between a failure "to forecast evidence sufficient to prove an element” of the plaintiff’s claim, and a failure "to allege facts sufficient to state elements” of the claim. Iodice v. United States, 289 F.3d 270, 281 (4th Cir.2002); see also Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992. This distinction is necessary to preserve the discovery process as a method of "discovering,” rather than merely confirming, information. When a plaintiff files his complaint, he cannot be expected to know all of the specific, or even critical, facts underlying a defendant’s challenged conduct. See Swierkiewicz, 534 U.S. at 512,T22 S.Ct. 992 ("Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case.”). Yet, the majority would require the Rule 12(b)(6) dismissal of any employment discrimination claim where the plaintiff does not know, before filing his complaint, those facts necessary to establish that the defendant considered an impermissible factor during its internal decision-making process.

.The majority also misconstrues what constitutes an allegation of "fact,” asserting that Jordan’s allegation that "race was a motivating factor” in IBM's decision to fire him is merely a "legal conclusion,” which must be supported by specific factual allegations. See ante at 346. On the contrary, that IBM fired Jordan "because he is African-American” is plainly an allegation of fact.

. The majority's reliance on our decision in Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761 (4th Cir.2003), is misplaced. In Bass, we concluded that the plaintiff had not alleged a hostile work environment claim because she alleged neither conduct sufficiently severe or pervasive to create a hostile work environment, nor that any of the “hostile” acts were motivated by a protected ground. See 324 F.3d at 765. Jordan, by contrast, has specifically alleged that he was fired (an adverse employment action) because of his race, or in the alternative that “race was a motivating factor.” Amend. Compl. ¶ 42. In so doing, he provided IBM adequate notice of his racially discriminatory firing claim. See Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992.

. I would thus reinstate two counts of Jordan's Amended Complaint: Count One (retaliation for engaging in protected activity, in contravention of Title VII, § 1981, and Montgomery County Code section 27-19); and Count Seven (racially discriminatory firing, in violation of § 1981).